GLADNEY, Judge.
Plaintiff, John R. Whyte, instituted this action alleging Dr. Denny E. Gamble, a licensed chiropodist practicing in Shreveport, and his liability insurer, the American Motorist Insurance Company, are liable to him in damages occasioned by acts of negligence in the performance of professional services. The judgment rendered after trial went against plaintiff who has taken this appeal.
The petition alleges for a cause of action that: Dr. Gamble exceeded his statutory authority in performing surgical procedure of a major nature and by using a knife for the correction of a deformity of the right great toe of petitioner; and also it is alleged the operation was performed in a grossly unskillful, nonprofessional, unapproved and negligent manner, and that proper post-operative procedure and treatment were not employed, which resulted in petitioner having an acute streptococcus infection. Damages in the sum of $10,800 are sought.
Respondent Gamble admitted that on May 10, 1957, he removed the medial sesamoid and a neuroma from the bunion area of the right foot, and avers that the procedure employed by him and the conditions under which such procedures were employed were proper, and exercised with the highest degree of care and skill. Defendants plead that plaintiff was contributorily negligent in several respects, and assert by reconvention a claim for damages for malicious prosecution arising from the institution of this suit. The trial court rejected the demand in reconvention and from this ruling no appeal was taken and consequently this part of the case is not before this court.
*299 Plaintiff visited Dr. Gamble on March 4, 1957, for professional attention to his right big toe which was causing pain and received treatment numerous times during the months of March, April and May, and on May 10 Dr. Gamble performed a surgical operation and removed the medial sesamoid bone. Whyte was confined in Gilmer Hospital for a period of two days, after which he was released and then continued to return to Dr. Gamble for treatment during the balance of the months of May and June. The wound became infected and after returning for additional treatment several times during July, plaintiff was dissatisfied with the doctor’s services and on July 15 went to see Dr. Ford J. Macpherson, an orthopedist, who hospitalized the patient in the North Louisiana Hospital for a period of nine days, after which treatment continued. He was hospitalized again on September 3 and on the 6th of September an operation was performed on his foot, he being discharged from the hospital on September 9. After some twenty-four recorded visits this patient was released by Dr. Macpher-son as being able to return to his work on December 6, 1957. Dr. Ray E. King, who examined plaintiff on December 17, 1957, was of the opinion that plaintiff at that time was not disabled.
Dr. Gamble testified he was licensed by the Louisiana Medical Board in 1952 and has practiced his profession since that time. His professional education included studies at the Chicago College of Chiropody, from which he graduated in 1952. In discussing the primary courses studied by him he testified that these were anatomy, physiology, histology, embryology, orthopedics and chiropodical surgery, along with other required studies.
The testimony of Dr. Gamble shows that when plaintiff came to his office on March 4, 1957, he appeared to be in good health other than a foot condition. Whyte complained that in the area of the first metatarsal phalangeal articulation of the right big toe he experienced pain which caused throbbing and tingling in the bunion area after walking. The doctor stated the examination revealed redness and swelling in and around the first metatarsal phalangeal joint, with pain upon palpation of the plantar surface of the area. Temperature in the area was elevated and there was a strong dorsalis pedis pulse. Movement and range of motion in the foot was normal. X-rays were taken and disclosed and enlarged medial sesamoid bipartite with a possible fracture of the medial sesamoid. For treatment, hydrocortisone was injected into the area. This treatment was continued on March 6 and on March 9 physiotherapy and a cast were applied. On March 13 the patient was given physiotherapy and his foot was strapped. This treatment was repeated on March 16 and March 21. On March 25, April 4, and April 19 he was given physiotherapy. On March 25 the prosthetic appliances were removed, and on April 9 and May 7 X-rays were taken. On the latter date the patient was advised that an operation for the removal of the sesamoid bone was indicated, and plaintiff was instructed to report to the doctor’s office on May 10, and was told not to eat any breakfast.
Whyte arrived at the doctor’s office shortly after 8:00 o’clock A.M. on May 10. The area to be operated on was shaved and both feet scrubbed with phisohex soap for five minutes, and the soap was allowed to stay on for approximately fifteen minutes. Sterile gauze was used and the soap was rinsed off with a 1 to 1,000 zepharin chloride solution and that was rinsed with a 70 per cent isopropyl alcohol, which was poured over the area starting with the toes. Tincture of metaphen was applied with sterile forceps and sponges, and a sterile sheet placed under the patient with his feet and legs let down on the sheet, the patient being draped with sterile surgical sheets and the area blocked off with sterile towels. Dr. Gamble was assisted in the operation by Dr. Legler, a chiropodist, and Mrs. Wolk-ing, who served also as his office clerk, but was not a trained nurse.
The preparation for the operation as undertaken by the two doctors and Mrs. *300 Wolking met with no objection from any of the medical experts called upon to express their opinions as to errors of omission or commission on the part of defendant. In addition to preparations made to provide sterile conditions on the part of the persons in attendance, and tools and supplies used in the operation, a new operating room constructed in Dr. Gamble’s clinic was used. It was thoroughly scrubbed and cleansed prior to the operation. The procedure of the operation was described:
Under local anesthesia, consisting of 10 cc’s 1% xylocaine with eprinophrine, the medial sesamoid from the bunion area of the right foot was removed under aseptic conditions, by making an incision in the area of the first metatarsal phalangeal articulation and a medial sesamoid bone was removed. A fibrous mass around the plantar nerve was excised. The incision was sutured with “000” catgut on the inside and with an outside suture consisting of nylon. By blunt dissection the joint was dissected through the subcutaneous tissue to the ligament that enclosed the sesamoid bone. Being careful not to excise the tendon the ses-amoid bone was dissected and excised. The instruments used were a retractor, hemostat, scalpel, surgical scissors and mouth-teeth forceps. In closing the incision raw catgut was used for the inside subcutaneous closure, and on the outside a dermal type of nylon suture was used. At this point the area was bandaged with sterile impregnated vaseline gauze directly applied. Sterile 2" x 2" pads were applied next and sterile 2" gauze on top of that. There was then applied a small tubular type of gauze, referred to as a boot.
Following the operation the doctor instructed the patient to remain off his foot, to keep it elevated and to use ice packs on thirty minutes, and off thirty minutes, and prescribed acromyocin and demerol, the latter for relief of pain. Immediately after the operation Whyte was placed in the Gil-mer Hospital for two days, after which he was released to go to his home. On May 14 the foot was inspected and redressed with plaintiff getting about on crutches. On May 18 the sutures were removed and the patient advised to limit his activities. On May 20 an examination of the foot revealed some suppuration, swelling and redess. The foot was re-dressed and the patient instructed to soak his foot in hot boric acid solution. On May 22 there was some inflammation and less suppuration, and the wound seemed to be in better condition. Physiotherapy was again recommended. On June 6 Dr. Gamble decided to re-suture a portion of the wound which appeared to have partially opened. On June 10 the wound was re-dressed and again on June 17. On June 20 antibiotics were started and treatment continued with combiotics (a combination of penicillin and dihydrostreptomycin) given intramuscu-larly. The patient appeared to improve until July IS when an examination revealed that the area was red and the patient had some lymph involvements. The doctor testified that at that time he attempted to get Whyte to go into a hospital so as to secure better control but he refused and transferred his case to Dr. Macpherson.
The profession of Chiropody is defined and the conditions upon which it may be practiced are set forth in LSA-R.S. 37:611-621. This statute states:
“§ 611 Definitions * * *
“(2) ‘Chiropody’ means the medical, mechanical, or surgical treatment of the minor ailments of the human foot, such as bunions, callouses, corns, and ingrowing and abnormal nails.”
“§ 621. Use of appliances or anesthetics
“Chiropodists may use any mechanical appliances which they think necessary for the relief or cure of their patients’ ailments. However, they may not correct deformities by the use of the knife or by amputation of the foot or toes. They may only use local anesthetics.”
Chiropody is classified under our law as a branch of medicine, the practice *301 of which is subject to the limitations above set forth. The general rule with reference to liability for professional negligence holds that a physician, surgeon, or dentist is not required to exercise the highest degree of skill and care possible in the treatment of patients, but he generally owes a duty only to exercise the degree of skill ordinarily required under similar circumstances by members of his profession in good standing, in the same community or locality and to use reasonable care and diligence with his best judgment in application of his skill to the particular case. Meyer v. St. Paul-Mercury Indemnity Co. of St. Paul, Minn., et al., 1954, 225 La. 618, 73 So.2d 781; Id., La.App., 61 So.2d 901, 905. In the cited case Judge Janvier, who was the organ of the Orleans Court of Appeal, in discussing whether in the case which involved a question of malpractice the doctrine of res ipsa loquitur was applicable, made this comment:
“We see a vast distinction between the situation in which a surgeon performs an operation in the usual, customary way and yet does not accomplish the desired result, and another situation in which a surgeon, while performing an operation, overlooks the fact that he has left in the abdomen, or in the wound, a sponge, or an instrument, or some other foreign matter. In the former case the doctrine of res ipsa loquitur should have no application. Surely the surgeon should not be required at his peril to show why the operation did not prove successful. In the latter case we think it obvious that the surgeon should be required to explain the most unusual occurrence. Illustration of this type of case is found in Whetstine v. Moravec, supra, in which the facts are quite similar to those found here. An oral surgeon, while extracting a tooth, permitted a part of the root of the tooth to ‘pass into plaintiff’s lungs’. The court held the doctrine of res ipsa loquitur to be applicable.”
We turn our attention to a consideration of plaintiff’s contentions as set forth above, first, that Dr. Gamble acted beyond his authority in performing the operation; and, second, that he was guilty of negligence.
We find the first contention is without merit. This is not an action to invoke penalties under the statute, but is predicated on LSA-C.C. Art. 2315, which affords plaintiff only a remedy for negligence. The argument is that the defendant doctor performed a major operation or an operation for a major ailment and that he used the knife in violation of the provisions of LSA-R.S. 37:621, supra. It was established by a preponderance of the testimony of the medical witnesses that removal of a sesa-moid bone was an act of minor surgery and when administered under a local anesthetic would not be considered a major operation. The evidence does not reveal that in violation of Section 621, supra, Dr. Gamble used a knife for the purpose of correcting a deformity, but operated to relieve an acute inflammatory condition.
In brief counsel for plaintiff asserts that the defendant doctor was negligent in the following respects:
The defendant was not qualified to perform such an operation; the operation was not performed in a hospital as it should have been; the personnel selected by the defendant to assist him in the operation were not qualified; proper pre-operative measures were not taken; improper instruments were used. The operation lasted an unusual length of time thereby exposing the wound to increased possibility of infection; local anesthetics were used whereas the orthopedic specialist would have used general; proper tourniquet was not used so as to afford the defendant a “bloodless” area in which to work; the wound was improperly bandaged; post-operative care was not proper. Sutures were removed too soon; presence of infection was not timely recognized; cultures were not run to determine the proper antibiotic. An infected *302 wound was re-sutured rather than allowed to drain; consultation with a medical doctor was not sought; hospitalization was not recommended; and proper records were not kept, but were manufactured for this lawsuit.
Testifying in the case and expressing their opinion as to the expertness of the procedures used by Dr. Gamble were Dr. Harold L. Chapman, a chiropodist, Dr. T. M. Oxford, Dr. Ford J. Macpherson, Dr. Bennett H. Young and Dr. Ray E. King, orthopedists. Counsel stipulated that Drs. Ray E. King and Willis J. Taylor, if called upon to testify, would do so in substantial accord with the testimony of Dr. T. M. Oxford. It was further stipulated that Dr. Wayne F. Taggert and Dr. Henry J. Llor-ens, chiropodists, would, if called to the witness stand, testify in substantially the same manner and give the same testimony as that given by Dr. Howard L. Chapman.
Hypothetical questions were addressed to Drs. Young, Macpherson, Chapman and Oxford, embracing the established facts pertaining to the pre-operative and postoperative treatment of plaintiff by Dr. Gamble, and also as to the detailed procedure during the operation. The evidentiary facts so employed have previously been set forth and were sufficiently proven. With ■the exception of Dr. Young, all of these doctors expressed opinions in somewhat the same vein as that of Dr. Oxford, who in answer to the question: “Was the treatment that this doctor gave the man similar in most detail to what you, yourself, would have done?”, said: “Well, possibly so; nobody can tell just what you are going to do under a given set of circumstances. The treatment he gave, I would say, was not negligent. It was certainly probably in line with what any other chiropdist or surgeon would do.”
Without reviewing in detail each of the specifications of negligence by plaintiff as enumerated above, we find none of these charges has been sufficiently established by the evidence. The weight of the professional opinion was that the operation was performed in an approved manner and those witnesses did not point to any negligent acts of the defendant doctor. The same was true as to diagnosis and to the pre-operative and post-operative treatment. We believe Dr. Young felt that Dr. Gamble was attempting to perform major surgery contrary to the licensing statute and also it is evident that he disagreed with respect to certain technique and treatment. Such disagreements, however, are not uncommon in the profession. The questions of whether plaintiff was contributorily negligent and whether Dr. Gamble failed to recommend hospitalization on or about July 15, 1957, are disputed facts, neither of which were proven. There was some criticism because Dr. Gamble did not require cultures in order to determine the specific treatment for the infection and to ascertain the sensitivity of the patient. The evidence reveals considerable difference in the medical opinions upon this point, but we find that such omission did not constitute an act of negligence forasmuch as the antibiotics so used cannot be said to have worsened plaintiff’s condition.
For the reasons hereinabove set forth it is our holding that Dr. Gamble did not exceed his authority under the provisions of LSA-R.S. 37:611-621, in operating upon plaintiff for the removal of a medial sesa-moid bone. The record indicates that such an operation is not to be considered a major ailment and the use of a knife in the operation was not for the purpose of correcting a deformity of the foot. It was shown by a preponderance of the evidence that Dr. Gamble exercised skill and care in the performance of his duties.
The judgment from which appealed is affirmed at appellant’s cost.