139 So.2d 61 (1962)
Victor CARROLL et ux., Plaintiffs-Appellees,
v.
Dr. Howard CHAPMAN et al., Defendants-Appellants.
No. 9677.
Court of Appeal of Louisiana, Second Circuit.
March 7, 1962.
Rehearing Denied April 4, 1962.
Certiorari Denied April 30, 1962.
*62 Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for appellant.
Bodenheimer, Looney, Richie & Jones, Shreveport, for appellee.
Before HARDY, GLADNEY, AYRES, and BOLIN, JJ.
GLADNEY, Judge.
Plaintiffs, Victor Carroll and Mrs. Cleo Carroll, instituted this action against Dr. Howard L. Chapman, and his liability insurer, National Surety Corporation, alleging that the doctor, a licensed chiropodist, performed an operation in a negligent manner upon her foot, which has resulted in disabling injuries, and that such operation was not explained, all of which amounted to an assault upon the person of Cleo Carroll without her knowledge and consent. Issue was joined through an answer in the nature of a general denial. Following trial, judgment was rendered in favor of plaintiffs, awarding Cleo Carroll $3,500.00 in damages and her husband, Victor Carroll, $825.00 for past and future medical expenses. From this decree the defendants have appealed, and plaintiff, Cleo Carroll, has answered the appeal asking that the award in her favor be increased to the sum of $13,000.00.
It is our understanding and appreciation of the position of appellees that they do not seriously contend the operation performed by Dr. Chapman was performed in an unskillful or negligent manner, but contend that the operation was performed without the consent of the patient. The record, in our opinion, clearly discloses the absence of any substantial proof of negligence or want of skill in the performance of the operation and subsequent treatment of the patient, Mrs. Carroll. The scope of our examination, therefore, is primarily concerned with evidence relating to whether or not the patient's consent was granted for the surgery undertaken by Dr. Chapman.
Dr. Chapman testified that he had been licensed to practice chiropody in Louisiana since 1938 and he is licensed also in the State of Arkansas. He related his education and training and association in professional societies, all of which seem to establish his qualification for practice in his chosen profession, which is classified under our law as a branch of medicine, the practice of which is subject to limitations set forth in LSA-R.S. 37:611-37:621. The statute states:
"§ 611. Definitions * * *
"(2) `Chiropody' means the medical, mechanical, or surgical treatment of the minor ailments of the human foot, such as bunions, callouses, corns, and ingrowing and abnormal nails."

*63 "§ 621. Use of appliances or anesthetics
"Chiropodists may use any mechanical appliances which they think necessary for the relief or cure of their patients' ailments. However, they may not correct deformities by the use of the knife or by amputation of the foot or toes. They may only use local anesthetics."
This action arises from surgical procedure by Dr. Chapman upon the right foot of Mrs. Carroll for the purpose of relieving a callous formation on the ball of or planta surface of the right foot. The relationship between the doctor and patient began in 1958, at which time Dr. Chapman removed callous from the bottom of the right foot without penetrating the outer skin. Thereafter the callous returned and worsened, resulting in an acute condition.
On February 8, 1960, Mrs. Carroll presented herself to the doctor whose examination disclosed an acute inflammation of the right forefoot and a severe nucleated callous under the ball of the foot. He testified that he recommended surgical correction of the cause of the condition, which, he stated, was due to unusual pressure brought about by a depressed metatarsal or possibly an enlargement of the metatarsal head of the second toe of the foot. His decision to resort to surgery was prompted by his experience which indicated mere excise of the callous would have brought about temporary relief only and that although the surgical procedure involved some risk, he did not explain such risk to the patient, but felt surgery was the proper remedy and that the chance of a deformity resulting would be unusual. He opined it was not possible before surgery to tell that someing might go wrong. Dr. Chapman related in detail preparatory procedure and then the operation, which he thus described:
"The incision through the skin was made over the second metatarsal head, or you could say the second metatarsophalangeal articulation, approximately 3.5 centimeters in length, extending from the distal proximal in the long axis of the metatarsal. This incision was deepened by a sharp and blunt dissection. Sharp dissection would indicate cutting and blunt dissection would indicate separating of the tissues in their natural striations. Extreme care was used to avoid all blood vessels and nerves."
* * * * * *
"A. I can best describe it by saying the incision extended from the connection of the toe bone to the foot bone.
"Q. Well, it was downwardI knowbut what part of the foot, the top of the foot or the bottom of the foot?
"A. The top of the foot.
"Q. All right, sir, go ahead.
"A. The metatarsal head was then freed from the surrounding tissue. The distal portion of the metatarsal was severed from the shaft of the bone by means of a bone cutting forceps. The head of the metatarsal was then brought up through the incision. The severed edge of the metatarsal shaft was smoothed by means of bone cutting forceps and a bone file. The capsule was washed by a sterile saline solution and then ¼th cc of Hydeltra TBA was instilled into the space. The capsule and the subcutaneous tissues were closed by means of one absorbable suture. The skin was closed by four interrupted mattress type dermal sutures. The incision was then covered with Aureomycin impregnated gauze, and the entire foot was wrapped with sterile gauze."
Concerning the understanding between the patient and himself prior to the operation as to the nature of surgery to be performed, the testimony of Dr. Chapman discloses:
"Q. Doctor, to get back to advising them on what was going to be done, *64 what did you actually tell them that you would do the following morning? The day before I believe they came to see you and you recommended surgery?
"A. That's right, yes, sir.
"Q. What did you tell them that day?
"A. That there would be a section of the bone removed, which was, I might say, impinging or bearing on this sore, inflamed area, that was actually behind the growth on the foot.
"Q. You advised them that you would remove a section of the bone?
"A. Yes.
"Q. You are certain of that, that you advised them
"A. I can't tell you my exact words, but I found out a long time ago that it is best to tell the patient exactly what to expect in the way of surgery. In other words, that is routine with me.
"Q. The reason I asked that question, Doctor, is some few years before she had come for the removal of the callous and the removal had been done from beneath the foot, and that is why I wanted to know exactly what you told her. Did you just tell her in the usual case or do you remember that you told herthat you told the Carrolls what you would do?
"Q. You do remember that you told them that you would remove a portion of the bone?
"A. Yes."
* * * * * *
"Q. You do not recall the exact words then that you used to tell Mrs. Carroll about the operation itself?
"A. No.
"Q. You have had a number of these cases, have you not, Doctor?
"A. Yes.
"Q. And your general procedure is to explain the operation to the patient?
"A. That's right.
"Q. Do you know now of your own knowledge that you did that in this particular case? Do you recall specifically having said that or is that merely the general way that you handle the patient?
"A. I would have to say that that is the regular routine way of talking to a patient concerning the surgery. The words that I usually use are, `To correct this condition we will have to remove a portion of the bone.'
"Q. But you do not know specifically whether you told her that or not at this time, do you, Doctor?
"A. No, I do not remember.
"Q. All right, sir. Could it be, Doctor, that you told her that you could remove this callous permanently?
"A. My words would probably indicate that the surgical procedure that I contemplated would give her permanent relief from the condition that she exhibited.
"Q. Then it is possible that you could have told her that, is that correct, sir?
"A. Yes.
"Q. All right. Do you recall anything she might have said to you?
"A. No, sir.
"Q. You don't recall her saying that if you can do that, get to digging?
"A. No, sir."
With reference to her understanding as to what type of surgery was contemplated, *65 Mrs. Carroll testified that following the examination of her foot on February 8th, he said:
"Are you ready for me to take it out permanently?" And I said, "Yes, sir, can you?" And he said, "Yes, I can," and I said, "Well, get your gas and go to digging." She denied further that the doctor explained to her the possibility of ill results from the operation. The doctor's testimony revealed he did not inform Mrs. Carroll of the risk involved. Mrs. Carroll testified that while she was on the operating table and the operation was in progress:
"A. I heard a beating noise, and I raised up and I said, `What in the world are you doing, man?' And he said, `I am cutting a piece of bone out of your foot,' and I said, `A piece of bone out of the top of my foot?' And he said, `Yes. If I didn't go in the top you would be on crutches for a week or more.' And I said, `Well, save me the bone,' and the bone I have at home now.
"Q. But prior to this time he hadn't mentioned the fact that he was going to remove any bone?
"A. No, sir, not at all. That was my first of it, when I asked him what he was doing.
"Q. Did he ask your permission to remove the bone?
"A. No, sir.
"Q. Had he started removing the bone at that time or had the bone been removed at the time you asked the question?
"A. He was whacking away at it."
Dr. Chapman admitted on the witness stand that the operation was not a success in that it did not achieve the results intended, and it brought about an elevation of the second toe above the plane of the first and third toes of the right foot, which condition, he said, could result in some discomfort.
The only other expert testimony tendered was that of Dr. Ford J. Macpherson, orthopedist of Shreveport, who testified that such operations are not always successful. He further testified:
"In this lady's particular case her treatment now, in my opinion, should consist of the procurement of low-heel, steel-shank, leather-sole, wide, round-toed oxfords with metatarsal bars and long arch prop should be utilized. This would be done in an attempt to shift the weight bearing. And if this relieved the pain of the neck of the second metatarsal as it sticks into the foot, as it sticks into the sole of the foot, I felt she could be made quite comfortable and no further surgery would be indicated. These shoes and the suggested corrections could also kick the second toe down. That is, pull it down, where the toe would be tolerable."
It is apparent that this prognosis was hopeful, but to a certain extent uncertain.
The legal principle is well recognized that in the absence of exceptional circumstances, an operation without the patient's consent constitutes an assault for which the patient may recover appropriate damages. Rogers et vir v. Lumbermen's Mutual Casualty Company et al., La.App., 119 So.2d 649, (2d Cir. Certiorari denied 1960). In the cited case this court pointed out that the general rule so stated extends to the performance of operations different in nature from that in which a consent was given, and to operations involving risk and results not contemplated. Counsel for appellees rely upon the Rogers case wherein authority for an appendectomy only was given, but the doctor not only removed the appendix, but also performed a complete hysterectomy. Surgery performed by a chiropodist employing the use of a knife, appliances and anaesthetics is restricted by statute as set out above. In Whyte v. American Motorists Insurance Company *66 et al., La.App., 122 So.2d 297, 80 A.L.R.2d 1272 (2d Cir.1960), we held that this surgery should be classified as minor. There is, of course, no contention in this case that Dr. Chapman exceeded his authority under the statute regulating his profession.
Clearly, the record shows an absence of express consent given by either Mrs. Carroll or her husband to perform an operation for the removal of a portion of a metatarsal bone in the foot. However, express consent is not always sacramental and under certain circumstances it may be implied or presumed. Thus, a patient who voluntarily submits himself for treatment, relying entirely upon the surgeon's skill and care to decide for him what shall be done, gives a general consent by implication, at least, to such operation as may, in the surgeon's skill and professional judgment, be reasonably necessary. As pointed out in Rogers v. Lumbermen's Mutual Casualty Company et al., supra, such consent in the case of a major operation cannot amount to permission to perform major surgery far beyond the foreseeability of the patient. 41 Am.Jur. § 109. In Hall v. United States, D.C., 136 F.Supp. 187, 5 Cir., 234 F.2d 811, the court was of the opinion that a doctor should discuss the nature of the operation contemplated in detail, if asked by the patient, but that he need not volunteer such information, and stated:
"In view of the testimony here to the effect that results such as Mrs. Hall's case are not expected nor probable, and considering the absence of Illinois law to the contrary, I hold that there was no duty upon defendant's agents in this case to warn Mrs. Hall of possible consequences or to obtain her specific consent to a spinal anesthetic. It follows that their failure to do so was not negligence and cannot form the basis of recovery here."
It is not to be presumed that as a general rule a patient would submit to major surgery without inquiring into the risk involved and the possible after-effects. The presumption is contrariwise with reference to a minor operation where the probability of ill consequences is rather remote. In Rolater v. Strain, 39 Okl. 572, 137 P. 96, 50 L.R.A.,N.S., 880, (1913) a judgment in favor of the plaintiff was affirmed where it was found that the patient had expressly instructed the surgeon not to remove any bone in her foot, but nonetheless he removed a sesamoid bone. There, as here, the doctor contended the removal was necessary to effect a cure. In refusing to find error in the finding of fact, the reviewing court observed the operation was not performed in the manner agreed upon and in the manner consented to by the patient, and, as a matter of fact, the actual operation performed was without her consent.
In the Restatement of the Law of Torts, § 62, there are set forth four conditions when an invasion of an interest of personalty of another, who has not consented thereto, does not make the actor liable. These embrace the exceptions to the general rule that the surgeon must have the consent of his patient. In the comment under this authoritative rule, it is pointed out implied consent, or implication of consent, is a fiction, but color must be given to this fiction by the fact that the circumstances must be such as to give the person rendering the services reason to believe that consent would be given if it were possible. The author then states:
"But in reality, the person whose right is invaded has not by word or conduct expressed either actual or apparent assent. The immunity is necessary in order that fear of liability may not deter others from rendering necessary services in an emergency."
We may observe that the relationship between a doctor and his patient is such that exact agreements are the exception rather than the rule. This is certainly true in cases where minor surgery and professional services are rendered and which do not *67 involve a major affliction. We opine that in the latter situations the courts have no intention of placing a handicap upon the ordinary functions performed by the professional medic nor to disturb the proper relationship between him and his patient.
In this case the established and uncontradicted facts disclose that Dr. Chapman prepared Mrs. Carroll for surgery in a manner which plainly indicated the operation would involve something different from that undertaken some two years prior thereto, when the treatment consisted solely of removing, without penetrating the outer skin, a callous on the ball of her foot. It is noteworthy, we think, that Mrs. Carroll did not inquire as to whether the procedure could affect any of the bones of her foot, nor did she expressly prohibit the removal or restrict in any manner the methods to be employed by the surgeon. The operation as performed followed customary local usage, was not unusual, and although resulting in a deformity of the second toe, such an occurrence was, indeed, a rarity in that type of operation. Preparations for the operation included X-rays, urinalysis, blood tests, and all other professional procedure for the performance of surgery. Mrs. Carroll expressed surprise that the operation was through the top of her foot rather than through the bottom. When this was discovered by her, she was under a local anaesthetic and could have at that time discussed the matter of consent with the doctor. She made no complaint of any sort until months afterward when she realized that she would have a deformity of the second toe. The foregoing circumstances indicate Mrs. Carroll was in nowise concerned as to whether a small bone would be removed from her foot, or that it was any matter to be greatly concerned with, forasmuch as the doctor had informed her that he would remove the cause of her condition permanently. We have concluded she gave her implied consent and that her real grievance is occasioned by the result of the operation, which, however, does not sustain liability.
For the foregoing reasons the judgment from which appealed is annulled, set aside and reversed, and plaintiffs' demands are rejected at their cost.
Rehearing denied; AYRES, J., dissents.