448 So.2d 852 (1984)
James STAFFORD, et al., Plaintiff-Appellant,
v.
LOUISIANA STATE UNIVERSITY, et al., Defendant-Appellee.
No. 16116-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1984.
Ike F. Hawkins, Jr., Shreveport, for appellant.
Booth, Lockard, Politz, LeSage & D'Anna by Nyle A. Politz, Shreveport, for appellee.
Before PRICE, HALL and NORRIS, JJ.
NORRIS, Judge.
In this medical malpractice action, plaintiffs appeal a judgment rejecting their claims against a university hospital and its governing authority for damages arising from an operation. The pivotal issue on appeal is whether a valid informed consent to the surgery was required. For the reasons hereinafter stated, we affirm.
James Stafford and Willie Holmes, the surviving husband and son[1] respectively of Ada Stafford, brought suit against Louisiana State University and Agricultural and Mechanical College Medical School at Shreveport and the university's Board of Supervisors (hereinafter collectively referred to as "LSUMC") after Mrs. Stafford's death. Mrs. Stafford, who was 64 years old and had been confined to a wheelchair for several years, was admitted to LSUMC on February 18, 1980 complaining of abdominal pain, vomiting and weight loss. One of the purposes of this admission was to rule out gastric cancer, and a series of tests was scheduled. After a gastroscopy was performed but before the other studies and tests could be completed, Mrs. Stafford developed ketoacidosis, a life threatening complication of diabetes. She responded affirmatively to the immediate steps undertaken to control that particular condition but developed a severe form of thrombophlebitis in her left leg which presented another life threatening situation because of her condition. Consequently, on February 26, 1980, her treating physicians obtained a consent and authorization from Willie Holmes to initiate surgical procedures to combat this condition. Thereafter, the vena cava was litigated in an effort to prevent blood clots from breaking loose, flowing to the lungs and resulting in pulmonary *853 embolism. However, because of Mrs. Stafford's condition, the planned thrombectomy designed to remove blood clots in the veins was too risky and was foregone. Following this surgery, the severity of the vascular disease present in Mrs. Stafford's left leg caused gangrene to develop which progressively worsened despite efforts to control it with conservative treatment. During the evening hours of February 29, 1980, this particular condition was discovered to have deteriorated to the point where surgery was required to amputate the left leg above the knee.
On March 4, 1980, Mrs. Stafford died from acute heart failure resulting from a large pulmonary embolus in the right lung. Thereafter, Dr. George McCormick performed an autopsy and confirmed the cause of death. However, he was unable to state with any certainty that the amputation had contributed to her death. The autopsy did reveal cancer of the pancreas which had mestastasized which Dr. McCormick opined was not the immediate cause of death but which may have contributed to it. Because of the extensive spread of this cancer, Mrs. Stafford probably would not have lived ninety days.
After trial, the trial court rejected plaintiffs' contentions that the surgery was unauthorized, performed in a negligent manner or was a contributing factor in Mrs. Stafford's death stating in pertinent part:
[C]onsent of a patient, express or implied, is not required prior to a surgical procedure "in case of an emergency requiring immediate surgery for preservation of life or health, under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume such responsibility.
* * * * * *
The court finds that the defendant's conduct was not negligent. Proceeding to amputate without written authorization, either from Mrs. Stafford, her husband or her son, when presented with a life threatening emergency, did not subject the hospital nor the Board of Supervisors to liability in damages to these petitioners.
Plaintiffs contend on appeal that the surgical procedure which resulted in the amputation of Mrs. Stafford's leg was performed without a valid informed consent in that a purported telephone consent which LSUMC contends was obtained was not a valid informed consent as is required by law. It is further contended that the trial court's determination that a bona fide "emergency" existed which rendered La. R.S. 40:1299.54 operable is erroneous.
The pertinent statutes applicable to this case are La.R.S. 40:1299.40,[2] 1299.54,[3] *854 1299.53[4] and 1299.55.[5] The doctrine of consent is explained in Pizzalotto v. Wilson, 437 So.2d 859 (La.1983):
The doctrine of consent to medical treatment is rooted in the idea that a person has the right to make major decisions regarding his own body. Justice Cardozo, when on the high court of New York, wrote "Every human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages." Schloendorff v. Society of New York Hospitals, 211 N.Y. 125, 105 N.E. 92, 93 (1914). A surgeon commits a battery on his patient when he undertakes a particular surgical procedure without the consent of the patient or an authorized person except, when an emergency requires immediate surgery for the preservation of life or health under circumstances when such consent cannot be practicably obtained. Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.), writ den. 362 So.2d 802 (La.1978); Coppage v. Gamble, 324 So.2d 21 (La.App. 2d Cir.), writ den. 325 So.2d 819 (La.1976); Carroll v. Chapman, 139 So.2d 61 (La.App. 2d Cir.1962); Rogers v. Lumbermens Mutual Casualty Co., 119 So.2d 649 (La.App. 2d Cir.1960); 1 F. Harper & F. James, The Law of Torts §§ 3.1-3.3, at 211-20 (1956). An emergency is statutorily defined as a situation, wherein, in competent medical judgment, the proposed surgical or medical treatment procedures are reasonably necessary, and a person authorized by statute to consent is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected or could reasonably result in disfigurement or impair faculties. La.R.S. 40:1299.54. Though a battery is generally manifested as an act of hostility, the basis of this battery is not the hostile intent of the physician, but rather the absence of consent on the part of the patient to a treatment that may in fact be beneficial. Thus, an unauthorized operation that is skillfully performed still constitutes a battery. Id. Prosser, Law *855 of Torts, 4th Ed. Ch. 2 § 9. The general rule prohibiting the performance of an operation extends to the performance of operations different in nature from that for which consent was given, and to operations involving risks and results not contemplated. Carroll v. Chapman, supra; Rogers v. Lumbermens Mutual Casualty Co., supra. See generally, Lacaze v. Collier, 434 So.2d 1039 (1983). [Emphasis supplied.]
The evidence in the instant case clearly reveals that Willie Holmes was the person who authorized the surgical procedures performed on his mother three days prior to the surgical procedure in question. He admitted that he informed LSUMC personnel that he was the party to be contacted at any timeday or nightin the event that anything occurred regarding his mother's condition. He furnished LSUMC with his telephone number. These facts are not disputed by Mr. Stafford. Because of these instructions, LSUMC acted in accordance with them and Dr. Dennis O'Bannion called Holmes at his home at approximately 8:00 p.m. on February 29, 1980 to inform Holmes of his mother's worsened condition and to obtain his oral consent to perform the operation. This call was taken by Holmes' wife because Holmes was not there. When informed that Holmes' whereabouts and time of return were unknown, O'Bannion, with nurse Peter Vlahakis listening to the conversation, explained to Mrs. Holmes that Mrs. Stafford's condition had deteriorated to the point where it posed an emergency situation because her gangrenous leg was lifeless and without immediate amputation death would result in the near future. O'Bannion requested that Mrs. Holmes consent to this surgical procedure which he stated that she did. Mrs. Holmes' testimony confirmed that of O'Bannion and Vlahakis regarding the phone conversation to the point where the consent was allegedly given which she denied.
Although it was known by the treating physicians as early as February 27, 1980 that some portion of the leg would have to be amputated because of the gangrene, the condition was being treated conservatively prior to taking this drastic step in order to attempt to save as much of the leg as possible and to avoid an above the knee amputation. The evidence established that surgeons do not normally obtain consent to amputate a limb until it is known with certainty what portion of the limb will be removed.
In connection with the treatment and procedure followed in Mrs. Stafford's case by LSUMC the trial court made certain findings of fact. It found that Mrs. Stafford received no treatment that fell below the accepted standard of medical care. It further found that when it became certain on the night of February 29, 1980 that the leg was actually dead, could not be salvaged and required amputation above the knee, that the situation was life threatening because of Mrs. Stafford's condition and the danger of infection. Accordingly, it was determined that there existed a situation of urgency at a time when Mrs. Stafford was not competent to consent to the surgery. It was finally found that when the urgency of the situation became apparent, neither Holmes nor Stafford were present and a good faith effort was made to contact Holmes, the person LSUMC was informed to contact in case of an emergency and from whom LSUMC had earlier received a surgical authorization and consent. All of these findings of fact are supported by the evidence.
Accordingly, we conclude that the trial court's determination that the emergency exception of La.R.S. 40:1299.54 was applicable to this factual situation was not manifestly erroneous because based on competent medical judgment the condition of Mrs. Stafford on the night of February 29, 1980 was acutely life threatening, the surgical procedure was necessary, a person authorized to consent was not readily available and any delay in treatment could reasonably have been expected to jeopardize her life and health. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Therefore, the judgment of the trial court rejecting *856 plaintiffs' demands is affirmed at the cost of appellants.
JUDGMENT AFFIRMED.
NOTES
[1] Holmes is not the son of the marriage between Ada and James Stafford but is of a prior union.
[2] La.R.S. 40:1299.40 provides:

A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
[3] La.R.S. 40:1299.54 provides:

In addition to any other instances in which a consent is excused or implied at law, a consent to surgical or medical treatment or procedures, suggested, recommended, prescribed or directed by a duly licensed physician, will be implied where an emergency exists. For the purposes hereof, an emergency is defined as a situation wherein, (a) in competent medical judgment, the proposed surgical or medical treatment or procedures are reasonably necessary, and (b) a person authorized to consent under Section 1299.43 is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected, or could reasonably result in disfigurement or impair faculties.
[4] La.R.S. 40:1299.53 provides:

In addition to such other persons as may be authorized and empowered, any one of the following persons is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures including autopsy not prohibited by law which may be suggested, recommended, prescribed or directed by a duly licensed physician:
(a) Any adult, for himself.
(b) Any parent, whether an adult or a minor, for his minor child.
(c) Any married person, whether an adult or a minor, for himself, and for his spouse.
(d) Any person temporarily standing in loco parentis whether formally serving or not, for the minor under his care and any guardian for his ward.
(e) Any female regardless of age or marital status, for herself when given in connection with pregnancy or childbirth.
(f) In the absence of a parent, any adult, for his minor brother or sister.
(g) In the absence of a parent, any grandparent for his minor grandchild.
[5] La.R.S. 40:1299.55 provides:

The provisions of this Part shall be liberally construed, and all relationships set forth herein shall include the marital, adoptive, foster and step-relations as well as the natural whole blood. A consent by one person so authorized and empowered shall be sufficient. Any person acting in good faith shall be justified in relying on the representations of any person purporting to give such a consent, including, but not limited to, his identity, his age, his marital status, his emancipation, and his relationship to any other person for whom the consent is purportedly given.