499 So.2d 1004 (1986)
Augustine B. LEMOINE and Joseph Lemoine, Plaintiffs-Appellees,
v.
INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants-Appellants.
No. 85-933.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1986.
Writ Denied December 12, 1986.
*1005 Charles A. Riddle, III, Marksville, for plaintiffs-appellees.
William H. deLaunay, Jr. of Provosty, Sadler & deLaunay, Alexandria, for defendants-appellants.
Before DOMENGEAUX, GUIDRY and YELVERTON, JJ.
GUIDRY, Judge.
This is a suit ex contractu and ex delicto for damages occasioned as a result of certain injuries allegedly sustained by Augustine Lemoine while a resident at Valley View Health Care Facility (Valley View) in Marksville. Royal, Inc. (Royal), the owner and operator of Valley View, and its insurer, Insurance Company of North America, were made defendants. Joseph Lemoine sought damages for the loss of consortium, service and society of his mother, Augustine.
The matter was tried on its merits on June 17 and 18, 1985. By a unanimous verdict, the twelve person jury found in favor of Augustine Lemoine and against Royal[1], holding that Augustine Lemoine suffered personal injury as a result of the fault of Royal. Royal's degree of fault or negligence was fixed at 40%. The jury awarded Augustine Lemoine $60,000.00 in damages. The jury rejected the claim of Joseph Lemoine. Royal appealed. Augustine and Joseph Lemoine neither appealed nor answered the appeal.
On appeal, Royal assigns the following errors:
1. The jury erred in finding that Valley View breached the duty of care owed by it to Augustine Lemoine; and, alternatively,
2. The jury erred in awarding excessive damages.

FACTS
Augustine Lemoine, known as Miss Gussie, entered Valley View on May 2, 1981 at the age of 69. She had stayed at Valley View on a prior occasion for a period of approximately nine months as a result of a broken hip. Miss Gussie was entering Valley View on this occasion for a permanent stay, because of her deteriorating physical condition and her need for overall general care. Miss Gussie suffered from peptic ulcers, a hiatal hernia, and rheumatoid arthritis. Miss Gussie was unable to walk and was confined to a wheelchair. She was totally reliant upon others to bathe, feed and clothe her. Miss Gussie's mental status was such that on occasion she would be lucid and coherent and at other times she would be confused and disoriented.
The bizarre events which form the basis of this suit were first detected in the latter part of September, 1982. At that time, Donna Caubarreaux, the Administrator of Valley View, was informed by a nurse that Miss Gussie's pubic hair had been dyed black by some unknown person. Caubarreaux did not inform any member of Miss Gussie's family about this occurrence, but instead simply advised the nurses on staff to keep an eye out for any future incidents. Miss Gussie's physician, Dr. L.J. Mayeux, was contacted, as Miss Gussie's perineal *1006 area had broken out in a rash. Dr. Mayeux prescribed by telephone for the affected area to be treated with Mycolog cream. The cream relieved the irritation and the rash cleared up within a week.
On October 21, 1982, attending nurses discovered that Miss Gussie's pubic hair had been again dyed. The nurses who made the discovery questioned Miss Gussie about the occurrence and she allegedly named her son as the culprit. The nurses' notes of that day reflect that her son, Joseph Lemoine, had visited with Miss Gussie that evening. Caubarreaux, the Administrator, was notified of this second incident the following day. Upon being apprised by her staff that Miss Gussie stated that her son had dyed her hair, Caubarreaux called in Miss Gussie's daughter, Anna Lee Burke, for a conference the following Monday. Caubarreaux explained to Anna Lee that her mother's pubic hair had been dyed and that Caubarreaux suspected her brother, Joseph, as the responsible party. Anna Lee went to speak to her mother in private in order to verify this information. According to Caubarreaux, Anna Lee returned and told her that Miss Gussie had admitted to her that "Bob" had done this to her. Anna Lee allegedly explained that "Bob" was a nickname for her brother, Joseph.[2]
Caubarreaux and Anna Lee thereafter decided that Joseph should not be allowed to visit his mother privately in her room. Caubarreaux spoke to Joseph that day about the dyeing incident and about the accusations made against him. Joseph agreed to restrict his visits with his mother to only public areas in the nursing home.[3]
Miss Gussie was again subjected to this bizarre conduct on December 24, 1982. Caubarreaux was informed of this third incident by the nurse on duty on December 26th. At this time, Caubarreaux talked with Anna Lee and Joseph. Anna Lee demanded that Caubarreaux procure an investigation of the incidents, by the proper authorities, in light of the fact that Joseph could not be the responsible party since he was precluded from seeing his mother in private.[4] Caubarreaux thereafter contacted the Sheriff's office, requesting an investigation of the matter.
Following the December episode, Miss Gussie became extremely upset and combative. She would cry out loud and ask to be taken out of the nursing home. At one point, Miss Gussie had to be physically restrained. After several days of refusing to eat and to take her medications, Miss Gussie was hospitalized in the Marksville General Hospital. After four days of hospitalization, Miss Gussie was transferred to another nursing home.
On January 7, 1983, Caubarreaux began an investigation into the matter. Caubarreaux interviewed and took written statements from all of the employees of the nursing home. It was at this time discovered by Caubarreaux that numerous unusual incidents involving Miss Gussie and her son, Joseph, had been observed in the past. At least seven aides told Caubarreaux of incidents where they would walk into Miss Gussie's room and find Joseph kneeling before Miss Gussie, who was seated in her wheelchair. The aides stated that Miss Gussie's gown would be raised up and Joseph was either touching or looking at Miss Gussie's "private parts". When confronted by the aides, Joseph would explain that he was checking to see if Miss Gussie was wet. The aides stated that Miss Gussie was fully able to ask for the bed pan when she needed it and that she seldom, if ever, wet in her pants. The investigation also revealed that Miss Gussie became very *1007 nervous and anxious when her son visited her.
At trial, nine nurse's aides, one licensed practical nurse, two registered nurses and a housekeeper, who were employees of Valley View at the time of these unusual occurrences, corroborated the findings of the above investigation. However, the majority of the witnesses testified that Joseph's bizarre behavior took place in December of 1982. Only one witness testified that she observed Joseph "fondling" his mother in July of 1982. Louise Jacobs, the housekeeper at Valley View, testified that she did not relate this incident to anyone because she was too embarrassed. It was not until January 7, 1983 that she informed Caubarreaux.
There was also testimony at trial of conversations overheard between Miss Gussie and Joseph, wherein Miss Gussie allegedly told Joseph, "[y]ou could go to prison for that," and "[y]ou better clear yourself because they gonna send you to the penitentiary because they know about you".
Finally, despite Caubarreaux's testimony that she had instructed all nursing home personnel to be on the alert for any unusual behavior regarding Miss Gussie following the September incident, the majority of the aides testified that the first they learned of the dyeing episodes was in December, 1982. They had not been notified of the two prior incidents.

VALLEY VIEW'S DUTY OF CARE
At the outset, we observe that we need not determine who perpetrated the offensive acts against Miss Gussie. The single issue for determination is whether Valley View breached the duty of care owed by it to Miss Gussie, and, if so, whether such breach caused or contributed to the damages which she suffered.
Our jurisprudence has consistently held that the degree of care which a nursing home owes to its patients is similar to that owed by a hospital to its patients. Robinson v. Gulf Insurance Company, 434 So.2d 487 (La.App. 2d Cir.1983), writ denied, 439 So.2d 1075 (La.1983); Murphy v. Allstate Insurance Company, 295 So.2d 29 (La.App.2d Cir.1974), writ refused, 299 So.2d 787 (La.1974). Although a nursing home is not the insurer of the safety of its patients, nevertheless, it is the duty of the nursing home to provide a reasonable standard of care taking into account the patient's mental and physical condition. Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3rd Cir.1971); Booty v. Kentwood Manor Nursing Home, Inc., 483 So.2d 634 (La.App. 1st Cir.1985).
Considering the above, we must determine whether the jury erred in its finding that the actions of Valley View in the instant case constituted a breach of the duty of care owed by it to Miss Gussie. This is an issue of fact to be determined by the trier of fact, and cannot be disturbed on appeal absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App.2d Cir.1984), writ denied, 457 So.2d 14 (La.1984).
We find no clear error in the jury's determination that defendant was negligent. We conclude that the evidence establishes that Valley View's employees failed to exercise the care required of them under the applicable law, and such failure constituted "fault" under La.C.C. art. 2315. This "fault" was a cause-in-fact of the injuries sustained by Miss Gussie.
In our opinion, Valley View's initial breach of its duty to Miss Gussie was its failure to inform any member of her family when the first dyeing incident was discovered in September, 1982. Miss Gussie's daughter, Anna Lee, had a right to be informed of her mother's physical condition, as she was the family member who admitted Miss Gussie into the nursing home. Anna Lee was also responsible for all of her mother's financial affairs. Had Anna Lee been informed of this invasion upon her mother's privacy, perhaps she could have elicited from Miss Gussie at that time the name of the person who had conducted the grossly offensive act and *1008 thereupon taken steps to possibly prevent a recurrence in the future.
The record also reflects that, despite Caubarreaux's alleged instructions in September for all employees to be on the alert for any further indecent behavior towards Miss Gussie, only a few employees were actually made aware of the September and October incidents. It was not until December that all employees became aware that such acts had taken place on two prior occasions. This breakdown in communication between those responsible for Miss Gussie's care allowed for the possibility of future incidents, as very few employees were actually on their guard for any unusual behavior. The importance of this communication failure is compounded by the fact that numerous employees of Valley View testified that they actually witnessed improprieties between Miss Gussie and her son, Joseph, and yet failed to notify their superiors. Needless to say, had these employees been aware of the dyeing incidents, they would have had serious cause to report the indecent behavior which they allegedly witnessed.
The evidence at trial also establishes that on at least one occasion prior to the first dyeing episode, an employee of Valley View had allegedly witnessed unusual behavior between Miss Gussie and her son. This incident went unreported. It is possible that had this first occurrence been reported, Miss Gussie could have been spared the unpleasantness and humiliation which she later suffered. Finally, we observe that Caubarreaux was clearly remiss in not conducting a full investigation into the matter until after the third incident. For these reasons, we conclude that the trial court did not err in finding that Valley View breached the duty of care owed by it to Miss Gussie and that such breach was a cause in fact of the damages which she sustained.

DAMAGES
Appellant argues on appeal that the damage award of $60,000.00 is excessive. We agree.
The record reflects that, as a result of the September dyeing incident, Miss Gussie developed a rash in the perinial area. Dr. Mayeux prescribed a cream for treatment of the rash and in less than a week it was cleared up. There was another skin irritation noted as a result of the October dyeing incident, which was again cleared up by the topical application of Mycolog cream.
Although the December dyeing incident did not produce the same physical problems as the two prior incidents, Miss Gussie became emotionally disturbed as a result thereof. The record indicates that, immediately after the last dyeing incident, Miss Gussie became extremely upset and refused all food and medications. Miss Gussie was hospitalized from January 3 through January 6, 1983.[5] Dr. Mayeux testified through deposition that the acute anxiety which Miss Gussie suffered from was directly related to the dyeing incident. He also opined that Miss Gussie's peptic ulcer disease was aggravated by the anxiety which she was experiencing. Miss Gussie was given Haldol while hospitalized. Upon her release from the hospital, Miss Gussie's condition was stable and she was returned to her standard nursing home medications. Dr. Mayeux still examines Miss Gussie on a regular basis and notes that she has not suffered any acute anxiety attacks since January, 1983.
Under the above facts, we find that the jury abused its discretion in awarding Miss Gussie $60,000.00 as damages. By making this determination, we in no way seek to diminish the seriousness of this matter. The ordeal which Miss Gussie suffered through on three separate occasions was demoralizing and humiliating. However, the record reflects that she suffered very minimal physical discomfort and, because of her overall physical condition, she was not fully aware of what had actually happened. Further, although the record reflects that Miss Gussie did suffer acute anxiety and emotional upset following the *1009 third incident, this condition was of short duration.
Based upon all of the evidence presented at trial, we find that the highest award that the jury reasonably could have made was $20,000.00. See Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979).

DECREE
For the above and foregoing reasons, the trial court's award of damages to Augustine Lemoine is reduced from $60,000.00 to $20,000.00. In all other respects, the judgment appealed from is affirmed. Royal, Inc. is cast for all costs of this appeal.
AFFIRMED AS AMENDED.
NOTES
[1] Although the initial suit by plaintiffs was brought against Royal, Inc. and Insurance Company of North America and an answer was filed on behalf of both defendants, the judgment rendered, in conformance with the jury verdict, was solely against Royal, Inc., with no explanation as to the absence of Insurance Company of North America.
[2] At trial, Anna Lee testified that her mother did not say that Joseph had dyed her pubic hair, but rather told her that, "[t]hey (the staff at Valley View) tell me that Joseph did this to me". Anna Lee also denied, as did Joseph, that "Bob" was a nickname for Joseph.
[3] Joseph testified at trial that he was accommodating to the wishes of Caubarreaux because he wanted to prove that he was not responsible for these indecent acts.
[4] Caubarreaux stated at trial that one of Miss Gussie's roommates had seen Joseph inMiss Gussie's room on Christmas Eve. This allegation was never substantiated as the roommate's testimony was never secured.
[5] All of Miss Gussie's hospital bills were paid for by the State.