DOUCET, Judge.
Defendant, Opelousas Health Care, Inc., (OHC), appeals from a judgment rendered in favor of plaintiffs, Armance Stanford and Bertha Johnson. Mrs. Stanford and Mrs. Johnson have answered defendants’ appeal.
FACTS
This action arose out of an accident involving plaintiffs’ sister-decedent, Louise Bertrand, the original plaintiff. Mrs. Bertrand was a seventy-three-year old resident of a nursing home operated by OHC. On September 16, 1984, while walking in the parking lot of the facility, she fell after being frightened by a small dog. She fractured her left arm and left hip as a result of the fall. She initially.filed suit against A.L. Berard, the owner of the dog, and, later added as defendants, his insurer, Continental Insurance Company (Continental), and OHC and its insurer, Ambassador Insurance Company (Ambassador). On January 8, 1985, Mrs. Bertrand died from a blood clot which lodged in her lung. Her sisters, Mrs. Stanford and Mrs. Johnson were substituted as party-plaintiffs. The sisters later, by a supplemental and amending petition, instituted a wrongful death action against all defendants. Various third-party demands were also filed by the respective defendants.
Plaintiffs subsequently dismissed their suit against Mr. Berard and Continental after compromising and settling their claims against them. Plaintiffs also later dismissed their suit against Amabassador. Following trial on the merits the jury found that OHC was 10% at fault. Mr. Berard, the owner of the dog, was found to be 90% at fault. Damages to the decedent, Mrs. Bertrand, were fixed in the amount of $225,704.31. Damages to Mrs. Stanford and Mrs. Johnson were fixed in the amount of $30,000 each. The damage awards were reduced according to apportionment of fault and a final judgment was signed awarding plaintiffs $28,570.43. Plaintiffs filed a motion for addition and/or judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. The trial judge entered a JNOV assessing fault at 50% to Mr. Berard and 50% to OHC and proportionately increased the final award to plaintiffs to $142,852.16. It is from this judgment that defendants have appealed and plaintiffs answered.
Mrs. Bertrand was placed in the home in April 1981, by her niece, Vemice Quebe-deaux. She was placed there because Mrs. Quebedeaux felt she could not care for her at home — at least, this is what the admission report stated. A “functional assess *1266 ments” form was placed in the record. It is dated March 9, 1982, and stated that Mrs. Bertrand could independently walk, get out of her bed or a chair in which she was sitting, dress herself, and wash her face, hands, and mouth (she had no teeth). She apparently needed assistance with bathing, shampooing and brushing her hair, putting on make-up, and cutting her finger and toe nails. She could eat with a fork and spoon. She had full control of her bowel and bladder functions and used a toilet rather than a commode chair. The report further described her as oriented to time, place, and person. All of the monthly assessment forms contained in the record show that Mrs. Bertrand never had any problems walking or taking care of herself except for personal grooming, and this appears to be due to personal grooming habits rather than any physical limitations.
The decedent's sister, Mrs. Johnson, had been placed in the same nursing home approximately three years earlier and still resided there at the time of trial. During the period the decedent resided at the nursing home she would push her sister, who was confined to a wheelchair, around the home. A number of nursing home personnel all testified that the decedent walked around without assistance. One home resident testified that the decedent danced at nursing home socials. Prior to being placed in the nursing home decedent resided with her niece, Mrs. Quebedeaux, for some two-and-one-half years. Mrs. Quebe-deaux testified that her aunt walked well without assistance. She visited the decedent often and further testified that her aunt was in fairly good shape physically and could have run if she wanted to. Mrs. Quebedeaux stated that when she visited her aunt she was “very much alert” and had “her right mind” until she died. Nursing home records repeatedly described the decedent as alert. There was evidence, however, that on occasion the decedent appeared forgetful and had to be reminded where she was residing.
Plaintiffs cite a notation on an admission report from April 1981 indicating that the decedent was nervous on the date of admittance. However, nowhere is there any indication that such nervousness was anything other than first day jitters. There are no other notations or testimony indicating that the decedent was a nervous or high strung person except perhaps that she smoked and walked around a lot. Mrs. Quebedeaux testified that her aunt was afraid of dogs. However, she never mentioned this fact to anyone at the nursing home nor was there any evidence that anyone at the nursing home was aware of this.
It was the policy of the nursing home that those residents mentally and physically capable of doing so were allowed to walk about on the grounds of the home, including a patio and parking area. A nurse’s station was located near the door where patients would exit and a buzzer connected to the door would alert personnel whenever a resident left the building. Nursing home personnel would periodically check on those residents who were outside.
The dog owner, Mr. Berard, resided directly across the street from the nursing home and had lived there even before the nursing home was built. The parking area of the nursing home was apparently located in the front of the building facility, towards the left side of the property. Adjacent to the parking area was a vacant lot. Twice a day, morning and evening, for the past seven years, Mr. Berard had walked this particular dog, “Leichin”, over to the lot to relieve himself. Leichin would often cut across the corner of the nursing home property in his rush to the lot. Before he acquired Leichin, he walked the same route with his small poodle for twelve years. Leichin was a Miniature German Schnauzer, standing approximately ten inches high, and measuring about fifteen inches long by three to five inches wide.
On the evening of the accident, September 16, 1984, the decedent went for a walk in the parking area of the home. Mr. Ber-ard left to walk his dog at about 7:00 p.m. He recalled that it was dusk; the sun had set but it was still light. As usual, he carried Leichin across the street, put him down in front of the nursing home, and proceeded towards the vacant lot. The dog was not on a leash. Mr. Berard paused to *1267 speak to someone and, hearing Leichin bark, looked to see the dog some ten feet from Mrs. Bertrand, who was in the nursing home parking area. Mr. Berard testified that Leichin was “running” towards the decedent, barking. She turned away from the dog as if to escape and fell to the ground, fracturing her left arm and hip. She was taken to a nearby hospital where a metal plate was placed in her left arm and a metal femural head prosthesis was implanted to repair her left hip. The artificial hip ball fell out of the socket twice and so a complete ball and socket prosthesis was implanted. During this time, Mrs. Bertrand resided in two other nursing homes and the hospital, when necessary for treatment. On January 8, 1985, she died as a result of a pulmonary emboli, or a blood clot which had lodged in her lung. A causal connection was established between the accident, subsequent immobilization of the decedent, and the development of numerous blood clots.
Nursing home personnel testified that it was well known that Mr. Berard regularly walked his dog in front of the nursing home, sometimes across the comer of the home property, on the way to the vacant lot. None of those who testified recalled ever receiving any complaints about the dog barking at, biting, chasing, or bothering anyone. Mr. Berard testified that Leichin never barked at, bit, or chased any of the nursing home residents. He admitted, however, that the dog barked a lot and had barked at others in the past.
Based upon this evidence, the jury made its determination that Mr. Berard was 90% at fault in causing the accident, while the nursing home was only 10% at fault. Based upon this same evidence, the trial judge found that as a matter of law, the nursing home was at least 50% at fault and entered a JNOV accordingly. It is from this judgment that defendants appeal and plaintiffs have answered.
In setting out his argument that the trial court erred in granting the JNOV, defendant contends that no fault should have been found on the part of the nursing home. Defendant cites La.C.C. art. 2321 which was interpreted by the Louisiana Supreme Court in Holland v. Buckley, 305 So.2d 113 (La.1974) as providing strict liability for owners of domesticated animals causing harm to another. Under art. 2321, when a domesticated animal harms another, the owner of the animal is presumed to be liable. However, the owner may exculpate himself by showing that the harm was caused by the fault of a third person for whom he is not responsible. Holland, supra; Martinez v. Modenbach, 396 So.2d 471 (La.App. 4th Cir.1981), writ denied 399 So.2d 620 (La.1981). The independant cause of the third person must be a substantial factor (proximate cause) in bringing about the harm. Martinez, supra; Daniel v. Cambridge Mutual Fire Insurance Co., 368 So.2d 810 (La.App. 2nd Cir.1979), writ denied 369 So.2d 1063 (La.1979).
The duty of a nursing home is to provide a reasonable standard of care taking into account the patient’s mental and physical condition. Lemoine v. Insurance Company of North America, 499 So.2d 1004 (La.App. 3rd Cir.1986), writ denied 501 So.2d 199 (La.1986); Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3rd Cir.1971). A nursing home’s duty to its patients does not include having an attendant follow an ambulatory patient at all times; Tait v. Western World Insurance Company, 220 So.2d 226 (La.App. 3rd Cir.1969), writ denied 254 La. 137, 222 So.2d 884 (1969).
All of the evidence shows that Mrs. Bertrand was physically capable of walking. In fact, she suffered no infirmities whatsoever in this regard and walked about regularly. She was able to push her sister around in a wheelchair and danced at social functions held in the nursing home. Plaintiffs attempted to portray the decedent as a confused invalid who wandered about aimlessly as if she were out of her mind. The facts show otherwise. Although she was at times confused about where she was residing, there is no evidence that she was not able to go outside and walk because of any mental confusion. The evidence, to the contrary, shows that she was alert and “in her right mind.” She *1268 was on the nursing home property when the accident occurred, not wandering the streets as plaintiffs would have us believe she was apt to do. In her three-and-one-half years in the nursing home she walked away once with another resident and they were merely strolling down the street. It was known that Mrs. Bertrand was out walking on the grounds of the nursing home when the accident occurred. One of the reasons the decedent apparently became alarmed was not because she was confused but that, unknown to nursing home personnel, she was afraid of dogs. We feel her reaction was not abnormal even for a person not possessed of a peculiar sensibility to dogs. All of the evidence shows that none of the nursing home personnel had ever heard of any problems with Mr. Berard’s little dog barking, biting, or attacking anyone, nor, in fact, had there ever been any such problems with regard to residents. There was no reason to prohibit residents from walking at times when Mr. Berard was walking his dog. In light of the record as a whole, we are compelled to find that there was no fault on the part of the nursing home. It violated no duty owed to the decedent. The fault of Mr. Berard was the sole proximate cause of the accident. The finding of the jury to the contrary, and the trial judge, was clearly wrong.
For the reasons assigned, we reverse the judgment of the trial court and recast it to read as follows:
IT IS ORDERED, ADJUDGED, and DECREED that there be and hereby is judgment in favor of defendant, OPELOUSAS HEALTH CARE, and against the plaintiffs ARMANCE STANFORD and BERTHA JOHNSON dismissing their suit against defendant with prejudice.
IT IS FURTHER ORDERED, ADJUDGED, and DECREED, that the following expert witnesses be allowed expert witness fees in the amount stated by their name and that the following expert witness fees be taxed as costs in this matter:
A. Dr. Sangita Shah $150.00
B. Jerry Leleux $150.00
C. Dr. Thomas Butaud $150.00
D. Dr. Earl Morreaugh$150.00
IT IS FURTHER ORDERED, ADJUDGED, and DECREED that all court costs in this matter at both the trial and appellate level be assessed against plaintiffs, ARMANCE STANFORD and BERTHA JOHNSON.
REVERSED AND RECAST.