559 So.2d 838 (1990)
James ROBERSON
v.
PROVIDENT HOUSE.
No. 88-CA-2406.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1990.
Rehearing Denied May 17, 1990.
*839 James S. Conner, Sr., Kenner, in pro. per., and for plaintiff-appellant.
C. Wm. Bradley, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendants-appellees.
Before BARRY, WARD and WILLIAMS, JJ.
WARD, Judge.
James Roberson appeals the dismissal of his personal injury lawsuit against the defendant nursing home.
Roberson sued Gemar, Inc., d/b/a Provident House (nursing home), its insurer Western World Insurance Company, and Dr. Joseph Brenner, his physician at the home. Roberson alleged that while he was at Provident House a catheter was implanted which caused an infection and bleeding. Roberson dismissed Dr. Brenner, a medical health care provider under La.R.S. 40:1299.47(B), because a complaint was not filed with the Medical Review Panel.
In a supplemental petition Roberson alleges that a catheter was inserted on April 20 and removed May 2, re-inserted May 7 and removed May 9, 1982. Roberson also alleged pain and mental anguish because Provident's employees failed to clean his room and eradicate roaches which crawled on his body. St. Paul Fire and Marine Insurance was substituted as insurer of Provident House and Western World Insurance was dismissed with prejudice.

TESTIMONY AND EVIDENCE
Roberson's deposition was admitted in lieu of live testimony. La.C.C.P. art. 1450. Roberson stated he has been a quadriplegic after being shot during a robbery in 1972. He was in several Veterans Administration hospitals over the years including the hospital in New Orleans. He often lives with Marcelle and James Conner (his sister and her husband) but resides in a nursing home when they are unable to care for him.
Roberson stated that when he was in a nursing home only an external catheter was used. He testified that a Memphis V.A. doctor had warned not to insert a catheter into his bladder because it would cause bladder spasms and the inability to urinate.[1] Roberson said an external catheter never caused a problem. Doctors tried an internal catheter in the Memphis hospital years ago but he could not urinate.
Roberson stated he went to Provident House in March, 1982 and a lady questioned him about the kind of food he liked and his hobbies, but he was never questioned about a catheter or medical matters. He claimed that Provident House employees did not take proper care of his external catheter.
Roberson said no one consulted him about changing the external catheter to an indwelling Foley catheter. He said he told the nurse that he did not want the internal catheter and he begged her not to insert it. She told him to shut up when he warned her that he could not tolerate an internal catheter.
Roberson testified it took about two days before he experienced pain and a burning sensation after the indwelling catheter was *840 inserted and a nurse removed the catheter. Roberson tried to stop the nurse before it was re-inserted. Subsequently Roberson complained, the nurse got aggravated, jerked the catheter out, and blood ran from his penis. Roberson was rushed by ambulance to the V.A. hospital and remained there for a number of days. When he was returned to Provident House his sister removed him from the premises.
When asked by defense counsel whether he experienced an irritation of the penis at Provident House, Roberson stated he did not. When defense counsel continued to ask whether Roberson could see if his penis was irritated, Roberson clearly stated that he could feel an irritation and that he was not "stupid." Roberson said he did not have an infection while at Provident House or when he arrived at the V.A. hospital. The V.A. hospital record indicates there was no infection. Roberson stated that he still experiences a burning sensation (which he did not have prior to the "jerking" incident) while urinating and takes medication for the problem.
Roberson's sister, Marcelle Conner, testified she cared for her brother for many years except when she was in the hospital. She stated that prior to the subject incident at Provident House her brother's urine was clear. During the day he used a urinal and at night an outdwelling catheter. She emphatically stated her brother was not incontinent, never previously had urinary infections, and he could tell her when he needed the urinal.
Mrs. Conner stated she was contacted by telephone by a Provident House representative who informed her that a Foley catheter was to be inserted. She was very upset and told the nursing home representative: "Please don't do this thing." After Roberson was rushed to the V.A. hospital, she testified he stayed for eight or nine days.
Mrs. Conner said her brother does not urinate as well as in the past and he experiences a lot of pain. His urine has a dark color and he has urinary tract infections.[2] His output decreased from about 1200 c.c. to 150 c.c. daily. Although he had been able to sit in his wheelchair for hours, now his kidneys hurt and wheelchair time has been severely restricted. On cross-examination Mrs. Conner stated that an indwelling catheter had been tried years earlier at a V.A. hospital and the doctors told her never to let an indwelling catheter be used because it could be fatal.[3] Although she thought the V.A. hospital had sent written orders as to the use of a urinal and outdwelling catheter, Provident House records do not contain such instructions.
James Conner, Roberson's brother-in-law with his power of attorney, testified that he went with Roberson on his first day at Provident House. Roberson was taken by ambulance and Conner brought personal items including a pot chair, wheelchair, a lift to get Roberson out of bed, cotton pads, and a bag of 40 or 50 outdwelling catheters provided by the V.A. hospital.
The Provident House charts and medical records show Roberson was admitted March 15, 1982 and Dr. Joseph Brenner was his doctor. Dr. Brenner, internist, testified as to his relationship with Provident House and said its records did not contain written V.A. instructions in March, 1982. Roberson's health care plan dated March 17, 1982 provided that incontinence should be handled by:
a) External catheter
b) Assist to commode chair or
c) Diapers.
There is no mention of an internal catheter until an April 9, 1982 entry on the physician's order sheet which states: "Insert Foley (PRN)." Dr. Brenner testified that a nurse informed him that the external catheter was ineffective and irritation was occurring. No nurse testified. On April 9, 1982 Dr. Brenner told the nurse to insert *841 the catheter "PRN", i.e., as needed. He said his decision to use the internal catheter was based on the nurse's report, but the doctor conceded that he never spoke to Roberson about his medical history or asked him about prior use of catheters or prohibitions.
The nurse's entry for April 20, 1982 shows the Foley catheter was inserted. The April 23, 1982 nurse's summary reflects:
Incontinent of urine & feces. Ext. cath D/ced due to irritation & ineffective. Foley cath inserted....
A nurse's notation on April 30, 1982 (the numbers are almost illegible) provides:
Family called and stated that they wanted internal cath. taken out and who (almost illegible) gave the order to put in (almost illegible) an external cath. Family stated that they want the internal cath. taken out.
The nurse's May 2 note shows the Foley catheter was removed "c/o burning sensationand family also complained about foley" Dr. Brenner testified the Foley catheter was re-inserted May 7, 1982 and he saw Roberson May 11, 1982 but made no notation. The May 11, 1982 nurse's summary states Roberson was very upset when the catheter was inserted and his sister over-reacted when the family was notified.
Roberson complained of pain in the area of the catheter and it was removed on May 19, 1982. The nurse's notes show there was bright red blood when the catheter was removed. Dr. Brenner was called and he advised that Roberson be sent to the V.A. hospital for emergency treatment.
The V.A. hospital records cover May 19-May 28, 1982, therefore the V.A. instructions to Provident House in March, 1982 are not included. The hospital summary listing the admission date of May 19, 1982 provides Roberson's history:
He was seen initially in the Emergency Room with a gross bloody discharge from the meatus after a history of attempted urethral catheterization at the Nursing Home for questionable incontinence.... He gave no history of previous urinary tract infection, pyelonephrosis or previous GE surgery. At the time of admission he had an external Foley catheter....
On May 19, 1982 the diagnosis was gross hematuria [discharge of urine containing blood]. The reason for admission was "blood & pus coming from penis....." The consultation sheet (May 21, 1982) states that Roberson is a sixty-year-old quadriplegic admitted "due to blood & pus from penis.... Urethral foley catheterization was attempted and caused bleeding."
The doctor's discharge note on May 27, 1982 lists the diagnosis as: (1) traumatic catheterization; (2) quadriplegic; (3) neurogenic bladder. The clinical record signed by Dr. Weiner contains specific instructions to the patient and/or family upon Roberson's discharge on May 27, 1982:
It was requested that an external catheter be used and that an indwelling Foley catheter not be inserted into his bladder for incontinence as another episode of gross hematuria might well ensue and since his urine was uninfected he is stable with an external Foley catheter.
Dr. John Potter, general practitioner, had treated Roberson in the past. He testified that the external outdwelling condom is preferred to an internal catheter which is much more dangerous and causes trauma. The internal catheter tends to cause inflammatory problems and infections when used for long periods of time (as with a quadriplegic). An external catheter can be cared for by washing the penis with water or a soft saline solution once or twice a day. Dr. Potter emphatically stated the external catheter is always preferred, especially for a quadriplegic in a nursing home. He clearly stated that irritation would not be a cause to switch to an internal catheter. When a quadriplegic is admitted to a hospital on an emergency basis it is standard procedure to insert an indwelling catheter.
Dr. Potter stated the penis is highly sensitive and the more it is traumatized, the more sensitive it becomes. Jerking the tube out of a patient's urethra which is tied in by an inflated catheter can cause extreme *842 irritation, trauma, and bleeding. When asked what future problems Roberson might face because of the "jerking" incident at Provident House, the doctor said that the more an internal catheter is used, the more irritation and scar tissue builds up. There is stenosis (constriction or narrowing) and it becomes increasingly difficult to catheterize the patient. The build up of scar tissue more likely than not will result in reduced urinary output. Dr. Potter stated that a reduction from 1200 c.c. to 150 c.c. daily indicates a urinary problem.
On cross-examination Dr. Potter read from the V.A. entry which stated Roberson had a gross bloody discharge from the penis after attempting to catheterize him for questionable incontinence at the nursing home. Dr. Potter stated there was no history of a urinary infection or bleeding at Provident House, therefore, he would very strongly consider that the catheterization manipulation produced the injury and blood.
When asked whether he would question Roberson's treating physician's decision to write an order that an indwelling catheter could be used PRN, Dr. Potter emphatically stated he would question that decision. He testified that irritation from an external catheter does not warrant changing to an indwelling catheter.
On redirect Dr. Potter said it is standard medical practice to ask a patient for a medical history and to inquire about prior use of an internal catheter.

TRIAL COURT'S REASONS AS TO NEGLIGENCE
The trial court's reasons noted Roberson's allegation that as a result of the implantation of the indwelling catheter he began to discharge blood which caused an infection. The trial court concluded:
In the absence of a showing of negligence or the breach of a standard of care by Gemar, Inc., d/b/a Provident House, its agents, servants and employees with respect to the injury or complaints of the plaintiff, and the Court being of the opinion that the care and treatment of the plaintiff by Gemar, Inc., its agents, servants and employees was at all times reasonable and proper and within the standard of care required of similar institutions, the suit will be dismissed with prejudice at plaintiff's cost.

SPECIFICATIONS
Roberson's appeal brief[4] specifies three trial court errors:
1. Disregard of his deposition which specifies a tear in his urinal tract was caused by the nurse who jerked out the catheter.
2. Failure to consider Dr. Potter's testimony as to the injury and its consequences.
3. Failure to consider that Dr. Brenner acknowledged that the injury was serious enough to send Roberson to the V.A. hospital for emergency treatment.
The trial court limited its conclusion to the issue of negligence (as pleaded in Roberson's petition) and concluded Roberson did not carry his burden of proving a breach in the standard of care of the nursing home.
It is the duty of a nursing home to provide a reasonable standard of care taking into account the patient's mental and physical condition. Doxey v. Riverside Guest Care Center, 520 So.2d 1118 (La. App. 3rd Cir.1987). Whether Provident House breached its duty of care to Roberson is an issue of fact to be determined by the trier of fact and cannot be disturbed on appeal absent a finding of manifest error. Lemoine v. Insurance Company of North America, 499 So.2d 1004 (La.App. 3rd Cir. 1986), writ denied 501 So.2d 199 (La.1986).
Considering the record and lack of expert testimony to establish the standard of care, we cannot conclude the trial court was *843 manifestly erroneous as to the negligence issue.
AFFIRMED.
BARRY, J., dissenting with reasons.
Mr. Roberson's horrendous experiences cry out for relief. Equity makes that possible.
A careful review of the record reveals that the pleadings were enlarged to include the issue of whether the catheter was inserted without the patient's consent. That clearly constitutes a battery. Battery is defined as any intentional or offensive touching of the person of another without the other person's consent. Cage v. Wood, 484 So.2d 850 (La.App. 1st Cir.1986); Restatement of Torts 2d, § 13 et seq. (1965).
The doctrine of consent to medical treatment is rooted in the idea that a person has the right to make major decisions regarding his own body. See generally Lacaze v. Collier, 434 So.2d 1039 (La. 1983). Justice Cardozo, when on the high court of New York, wrote `Every human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages.' Schloendorff v. Society of New York Hospitals, 211 N.Y. 125, 105 N.E. 92, 93 (1914). A surgeon commits a battery on his patient when he undertakes a particular surgical procedure without the consent of the patient or an authorized person, except when an emergency requires immediate surgery for the preservation of life or health under circumstances when such consent cannot be practicably obtained. (citations omitted). An emergency is statutorily defined as a situation wherein, in competent medical judgment, the proposed surgical or medical treatment procedures are reasonably necessary, and a person authorized by statute to consent is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected or could reasonably result in disfigurement or impair faculties. La.R.S. 40:1299.54. Though a battery is generally manifested as an act of hostility, the basis of this battery is not the hostile intent of the physician, but rather the absence of consent on the part of the patient to a treatment that may in fact be beneficial. (footnote omitted).
Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 437 So.2d 859, 862 (La.1983).
La.C.C.P. art. 1154 provides in pertinent part:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading.
Pleadings may be enlarged by evidence adduced without objection which is not pertinent to any of the issues raised by the pleadings and would therefore have been excluded if objected to timely by the opposing party. Official Revision Comments to Article 1154; Bruneau v. Colon, 542 So.2d 560 (La.App. 5th Cir.1989); Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir. 1981).
Roberson's testimony placed at issue the lack of his consent to the insertion of the indwelling catheter. At the beginning of his deposition it was stipulated that all objections were reserved until the deposition would be used at trial. The deposition (at which Roberson was not represented by counsel) was placed into the record in lieu of live testimony without objection.

ANALYSIS OF THE BATTERY CLAIM
Roberson emphatically stated he was certain that he was not to have an indwelling catheter because years earlier at a V.A. hospital doctors unsuccessfully attempted to insert one. During questioning by defense counsel Roberson stated no one at Provident House consulted him about changing from the external to the indwelling catheter. Roberson testified:
Q. Did anybody at Provident House talk to you, or consult you, about changing over from an external to an internal?
*844 A. No, sir. Just did it. I said, "I don't want that. Don't do that to me."

* * * * * *
Q. All right. Well, let's talk a little bit more about the catheter. You don't know who ordered
A. No, sir.
Q. that you were to be changed from an external catheter to an internal
A. No, sir. I just kept begging `em don't do it, though.

* * * * * *
A. I said to her, "Don't do it"; she said, "Shut up"

* * * * * *
A. Yeah, I saidI kept asking her, "Don't do that." I said, "I can't wear no internal catheter in me. You going to messyou going to ruin me."
Q. Why did you say that?
A. They said I couldn't wear one of them.
Q. Somebody told you that?
A. They tried one in Memphis, Tennessee years ago.
Q. So you had had one before?
A. They tried it; took it right out. They tried it. Put it on the record, that I can't ever wear one.
Dr. Brenner stated that he did not ask Roberson about the use of an internal catheter. When asked whether his decision to allow the insertion of the Foley catheter would have been affected by Roberson's statement that he could not tolerate one, Dr. Brenner stated: "Depending on what situation I was dealing with."
When further questioned as to whether he would have recommended the indwelling catheter in a non-emergency situation after the patient informed him that he could not use such a catheter, Dr. Brenner responded:
This given, this is hard because it becomes judgment. Patients saying that certain things can't be done sometimes has little to do with what should be done or has to be done. But in my personal way of dealing with patients in practicing, I do try to abide by their instructions, needs and wants, when these are given to me by family or patient.
Although Dr. Brenner disclaimed personal knowledge of Roberson's protest, the staff was well aware of the situation. The May 11, 1982 nurse's summary states:
"Pt became very upset when catheter was inserted & notified his family. Pt's sister over reacted to pt's statements & confronted staff...."
Both Roberson and his family told Provident House's staff that an indwelling catheter should not be used. Roberson's sister testified that she confronted a staff member by telephone. Roberson's brother-in-law brought 40-50 external catheters (provided by the V.A. hospital) to Provident House. Yet a Provident House nurse and/or nurses, following Dr. Brenner's written orders, inserted a catheter, removed it, re-inserted it, and removed it on May 19, 1982, which necessitated emergency hospital treatment.
Roberson's deposition concerning his lack of consent was introduced without objection. Therefore, the defendants waived any complaint as to enlargement of the pleadings. Shurman v. Lewis, 465 So.2d 78 (La.App. 5th Cir.1985).
When a patient does not consent to a surgical procedure, the doctor may be liable even if good results are obtained. The physician must obtain the patient's consent before he is legally entitled to commence treatment. LaCaze v. Collier, 434 So.2d 1039 (La.1983). See also Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978), writ denied 362 So.2d 802 (La.1978).
La.R.S. 40:1299.56, part of the Louisiana Uniform Consent Law, provides that nothing in the consent statute shall be construed to "abridge any right of a person eighteen years of age or over to refuse to consent to medical or surgical treatment of his own person."
Roberson never consented to the insertion of the internal Foley catheter and told the nurse he could not tolerate that catheter and begged her not to insert it. Roberson *845 is a quadriplegic and could not physically resist. The nurse did not testify, but the nurses' notes substantiate that Roberson was very upset when the catheter was inserted as was his family, who demanded the catheter be removed. It was removed May 2, 1982, but re-inserted May 7, 1982.
Dr. Brenner testified there was no emergency situation which precipitated the insertion of the Foley catheter. In fact, Roberson did not have a urinary infection, the only reason according to Dr. Potter's testimony to switch to the indwelling catheter.
The battery theory and the informed consent doctrine in Louisiana incorporate the philosophy that every adult human being of sound mind has a right to determine what shall be done to his own body. Hondroulis v. Schuhmacher, 546 So.2d 466 (La.1989); Douget v. Touro Infirmary, 537 So.2d 251 (La.App. 4th Cir.1988). There was no commitment or curator appointed to represent Roberson. The defendants did not attempt to prove that Roberson was of unsound mind. The principle is the touchstone for the doctrine that a patient has a right to determine the fate of his body and life, a right to physical integrity. Boland, The Doctrines of Lack of Consent and Lack of Informed Consent in Medical Procedures in Louisiana, 45 La.L.Rev. 1 (1984). See generally 12 Stone, Louisiana Civil Law Treatise: Tort Doctrine § 123 et seq. (1977); Restatement of Torts 2d § 13 (1965).
Roberson was rushed to the V.A. hospital for emergency treatment after removal of the Foley catheter and was hospitalized for eight days. Roberson testified that he has pain when he urinates and takes medication. His sister, Mrs. Conner, stated that he has urinary problems since the incident and his wheelchair time has been severely reduced. Dr. Potter testified that scar tissue builds up over years and problems worsen after a trauma such as that suffered by Roberson.
The trial court did not take into consideration that the pleadings were enlarged to include a claim for battery. I am satisfied Roberson proved the insertion and removal of the indwelling catheter over his protest and that of his family caused pain and suffering for which he should be compensated by Gemar, d/b/a Provident House, because its staff caused the injury.
Roberson itemized damages to cover doctor's services, trained nurses, drugs, physical suffering, and mental anguish. I do not agree with the defendants' position (post trial memo) that Roberson's prayer for "damage he has suffered" precludes a future award. Roberson did not prove damages as to doctor and nurse services or drugs. He did not set forth evidence to support a mental anguish claim. There is adequate proof of pain and suffering, recompense for which cannot be calculated with precision. Walton v. William Wolf Baking Company, 406 So.2d 168 (La.1981), quoting Boutte v. Hargrove, 290 So.2d 319, 322 (La.1974).
Unquestionably Mr. Roberson suffered as a result of this traumatic experience.
$50,000.00 would be a reasonable award for past and future pain and suffering.
Insurance policies were not placed into evidence and I cannot determine whether an exclusion is applicable. I would remand to determine whether St. Paul Fire and Marine Insurance Company should also be cast in judgment.
NOTES
[1] Although Roberson's deposition contains hearsay as to V.A. catheter instructions and defendants/appellees so argue in their brief, the testimony was not objected to at trial. Roberson's statements as to his protests against the indwelling catheter are not hearsay.
[2] Roberson's counsel stipulated that the issue of urinary infections would not be considered if damages were awarded.
[3] Roberson's counsel tried to elicit this testimony during direct examination, but his questions were met by defense objections. The court allowed statements as to V.A. hospital instructions given to Mrs. Conner for the limited purpose of explaining why she reacted as she did when she learned about the indwelling catheter.
[4] Roberson submitted to this Court a copy of a newspaper article on Provident House's problems. We cannot consider any documentation that was not before the trial court. Puccio v. Finch, 438 So.2d 597 (La.App. 4th Cir.1983).