437 So.2d 859 (1983)
KARL J. PIZZALOTTO, M.D., LTD.
v.
Dietrich WILSON.
No. 82-C-1142.
Supreme Court of Louisiana.
September 2, 1983.
Rehearings Denied October 7, 1983.
*861 Roy Maughan, Maughan & Atkinson, Ltd., Baton Rouge, for defendant-applicant.
W. Luther Wilson, Taylor, Porter, Brooks & Phillips, Baton Rouge, for plaintiff-respondents.
DENNIS, Justice.
In this case the trial jury and the court of appeal, 411 So.2d 1150, refused to hold a surgeon liable for removing a woman's reproductive organs without her consent. We reverse. The evidence presents no reasonable basis for finding that the woman consented either expressly or impliedly to a removal of her reproductive organs. Regardless of the reasonableness of the surgery or its eventual necessity, a physician may not act beyond his patient's authorization, except when a situation seriously threatens the health or life of the patient. There is no warrant in the record for a determination that the surgeon was forced by such a situation to remove the woman's female organs before obtaining her consent.
Dietrich Wilson first saw Dr. Pizzalotto in September 1978, complaining of lower abdominal pain that became so severe during her monthly menstrual periods that she was unable to walk. Dr. Pizzalotto's clinical examination indicated a potential adnexal cyst (a cyst in her tubes and ovaries caused by an outside source) or an endometrioma (an ovarian cyst internally caused by severe endometriosis), in either case complicated by pelvic inflammatory disease. Dr. Pizzalotto prescribed antibiotics in an attempt to decrease the inflammation and pain and to enable a more thorough examination.
Before Ms. Wilson saw Dr. Pizzalotto again, she consulted Dr. Linda Stewart for a second opinion. Dr. Stewart also diagnosed the pain as attributable to a pelvic inflammation and endometriosis, a disease whereby the endometrium, the lining of the uterus, backs up into the uterus, fallopian tubes and ovaries rather than being emptied from the uterus during the menstrual period. Once it backs up, the endometrium passes through the surface of the reproductive organs causing cysts and adhesions that form in reaction to blood irritating the surface of the organs. The adhesions cause the reproductive and other pelvic organs to become attached to one another and increasingly distorted until, if not treated, sterility results. Ms. Wilson was stirred by this explanation to do some independent reading on the subject of endometriosis.
Dr. Pizzalotto next saw Ms. Wilson in November, at which time he obtained her permission to conduct a laparoscopy, which is a diagnostic examination involving insertion of a small telescope through the navel. On the consent to operate form, Ms. Wilson crossed out and initialed provisions indicating an awareness that sterility may result from the operation because, as she explained, she knew that sterility would not result from the diagnostic examination. The laparoscopy enabled Dr. Pizzalotto to confirm the presence of endometriosis and pelvic inflammation, of which he informed Ms. Wilson. However, because of the presence of massive lesions, he was unable to ascertain the extent of her condition. The reproductive organs had adhered to one another and Dr. Pizzalotto's vision was blocked.
Dr. Pizzalotto then prescribed a laparotomy, an exploratory operation which involves an incision into the abdomen. Dr. Pizzalotto did not discuss with his patient any alternative method of treatment, or the risk of sterility from this operation. The written explanation provided by the doctor to Ms. Wilson was as follows:

*862 "Dx (1) Pelvic inflammatory disease, marked (2) endometriosis
Rec (1) LaparotomyLysis of adhesions, Fulguration of endometrioma
The doctor wrote on the hospital admission chart the same procedures outlined above, which are exploratory and conservative in nature, and added "probable salpingo-oophorectomy," which is surgical removal of the uterine tube and an ovary. However, Ms. Wilson was not informed of this.
Ms. Wilson signed a standard consent form and the operation was performed. During its course, the doctor found extensive endometrial adhesions much worse than he had anticipated. He felt that the reproductive organs were so severely damaged that Ms. Wilson was sterile. He felt that the failure to remove the reproductive organs would result in pain and infection necessitating more surgery prior to Ms. Wilson's leaving the hospital. After the assisting surgeon concurred in this finding, Dr. Pizzalotto proceeded to perform a total hysterectomy and bilateral salpingo-oophorectomy, which accomplished a total removal of all of the reproductive organs.
Ms. Wilson became very upset when she learned that a total hysterectomy had been performed. Failure to pay her surgical bill precipitated the litigation now under review.
The decisive issues are whether the facts of this case justify the conclusion that the patient expressly or impliedly consented to the performance of the hysterectomy, or whether a life threatening emergency arose during surgery which authorized the doctor to act without his patient's consent. Because we resolve these issues in the patient's favor, and because we agree with the court of appeal's exculpation of the physician from any breach of negligence or malpractice standards, the other issues considered by the previous courts are pretermitted.
The doctrine of consent to medical treatment is rooted in the idea that a person has the right to make major decisions regarding his own body. See generally Lacaze v. Collier, 434 So.2d 1039 (La.1983). Justice Cardozo, when on the high court of New York, wrote "Every human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages." Schloendorff v. Society of New York Hospitals, 211 N.Y. 125, 105 N.E. 92, 93 (1914). A surgeon commits a battery on his patient when he undertakes a particular surgical procedure without the consent of the patient or an authorized person, except when an emergency requires immediate surgery for the preservation of life or health under circumstances when such consent cannot be practicably obtained. Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.), writ den. 362 So.2d 802 (La.1978); Coppage v. Gamble, 324 So.2d 21 (La.App. 2d Cir.), writ den. 325 So.2d 819 (La.1976); Carroll v. Chapman, 139 So.2d 61 (La.App. 2d Cir.1962); Rogers v. Lumbermens Mutual Casualty Co., 119 So.2d 649 (La.App. 2d Cir.1960); 1 F. Harper & F. James, The Law of Torts §§ 3.1-3.3, at 211-20 (1956). An emergency is statutorily defined as a situation wherein, in competent medical judgment, the proposed surgical or medical treatment procedures are reasonably necessary, and a person authorized by statute to consent is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected or could reasonably result in disfigurement or impair faculties. La.R.S. 40:1299.54. Though a battery is generally manifested as an act of hostility, the basis of this battery is not the hostile intent of the physician, but rather the absence of consent on the part of the patient to a treatment that may in fact be beneficial.[1] *863 Thus, an unauthorized operation that is skillfully performed still constitutes a battery. Id. Prosser, Law of Torts, 4th Ed. Ch. 2 § 9. The general rule prohibiting the performance of an operation extends to the performance of operations different in nature from that for which consent was given, and to operations involving risks and results not contemplated. Carroll v. Chapman, supra; Rogers v. Lumbermens Mutual Casualty Co., supra. See generally, Lacaze v. Collier, 434 So.2d 1039 (1983).
It is undisputed that Ms. Wilson did not expressly consent to the removal of her reproductive organs. Furthermore, the argument that she impliedly consented is also without merit. The surgery authorization form contained no mention of a hysterectomy or removal of her reproductive organs. She consented in writing only to a "laparotomylysis of adhesions, fulguration of endometrioma." A laparotomy is an exploratory and conservative operation to burn the adhesions which had entangled these organs. It does not entail the removal or destruction of reproductive organs. Ms. Wilson never said anything which signified her consent to a hysterectomy. Dr. Pizzalotto was aware of Ms. Wilson's strong desire to eventually have children. She had even read extensively on her diagnosed problems in order to more fully understand the nature and risks of the doctor's recommended treatment. Dr. Pizzalotto admitted that he never discussed with his patient the possible removal of her reproductive organs. The purpose of the operation which Dr. Pizzalotto performed was inimical to the aim of the surgery to which the patient consented. She agreed to a limited conservative operation calculated to save her reproductive organs but was instead subjected to a hysterectomy by which the organs were irrevocably removed. Neither Dr. Pizzalotto's belief that she was already sterile, nor his opinion that postponing removal would necessitate further surgery before she left the hospital fairly indicate that Ms. Wilson impliedly consented to the immediate removal of these organs.
That the physician may have complied with La.R.S. 40:1299.40 insofar as a "laporotomy-lysis of adhesions, fulguration of endometrioma" is concerned, by informing her of the risks involved and obtaining her consent to these procedures, did not relieve him of his legal duty to inform her of the risks involved in a hysterectomy, which is a different procedure, and to obtain her consent thereto before it was performed.[2] La.R.S. 40:1299.40 prescribes the legal duty of a physician to inform his *864 patient of the known risks involved in the medical or surgical procedure he proposes to perform. If he fulfills this duty he cannot be held responsible for his failure to follow some different mode of giving notice of the risks involved in the medical or surgical procedure to be performed. However, his compliance with respect to a particular medical or surgical procedure is not a talisman before which all other legal duties disappear. If a physician only informs a patient of the risks of one operation and performs an entirely different surgical procedure, clearly he has not complied with his duty to inform the patient of the danger involved in the surgery actually performed.
The policy favoring patient consent to medical treatment must not impair a physician's ability to handle an emergency that immediately and seriously threatens a patient's health or life. However, this is not a case where the life or health of the patient was threatened by the failure to immediately remove her reproductive organs. Of the five medical witnesses, none testified that endometriosis was a life-threatening condition or that removal of Ms. Wilson's reproductive organs was immediately necessary. Dr. Pizzalotto felt that the organs would have to be removed before Ms. Wilson left the hospital, but he did not say that they had to be removed during the course of the exploratory surgery. Dr. Jack Holden, the pathologist who examined Ms. Wilson's organs, testified that Dr. Pizzalotto may have been criticized heavily for not removing Ms. Wilson's uterus, tubes and ovaries, but his testimony does not suggest that immediate removal was necessary. Moreover, when asked whether Ms. Wilson's condition at the time of admission was life-threatening, Dr. Holden testified that to answer would require a clinical judgment on his part which was out of his area of expertise. Dr. Richard Dickey and Dr. Paul Jackson, Jr., the patient's experts, both testified that endometriosis is not a life-threatening or a critical condition. Dr. Dickey further testified that postponing additional surgery to a later date, until the surgeon can inform the patient of new findings and obtain the patient's express authorization, is a legitimate treatment option. He testified that some doctors would remove the reproductive organs in a case like the instant one, but only if there is a clear understanding that the patient does not wish to preserve a reproductive function. Dr. Dickey testified that he would personally refuse to remove the reproductive organs without a prior consent. Dr. Jackson was in total accord with this view. He testified that the common practice among physicians is to discuss all treatment options beforehand, and to determine if the patient desired to retain fertility. Faced with a case such as the one at hand, Dr. Jackson stated that he would have listed on the consent form all of the possible treatments, from the simple laparotomy to the performance of a hysterectomy with a bilateral salpingo-oophorectomy, and that he would not have performed the operation unless he had obtained prior consent. Under rigorous cross-examination, he stated that he would "leave it in" if he had not discussed the possibility with the patient beforehand.
This evidence clearly establishes that the emergency exception is not applicable to Ms. Wilson's case. Her condition was not critical or life-threatening. Dr. Pizzalotto did not establish that the immediate further surgery was necessary. His testimony indicates only a possibility, or at most a probability, that additional surgery would be required before Ms. Wilson left the hospital. Drs. Jackson and Dickey testified that, despite the normal risks of further surgery, such as an additional exposure to the risks of anesthesia or infection, the hysterectomy or the bilateral salpingo-oophorectomy should not have been performed at that time without prior consent by Ms. Wilson. La.R.S. 40:1299.54 provides that an emergency which implies consent to a surgical procedure is one in which the procedure is reasonably necessary, a person authorized to consent is not available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected. The evidence conclusively shows that a delay of the total hysterectomy, at least until Ms. Wilson could decide the fate *865 of her organs for herself, would not have jeopardized her life or her health.
By way of a further element of defense as to consent, it has come to our attention that Ms. Wilson signed a blanket authorization at the time of her admission to the hospital. The hospital's printed form authorized, inter alia, "the performance of operations and procedures in addition to or different from those now contemplated, whether or not arising from presently unforeseen conditions which the above named doctor or his associates or assistants may consider necessary or advisable in the course of the operation." However, as Judge Hardy observed of a similar blanket authorization in Rogers v. Lumbermens Mutual Casualty Company, supra, "the above so-called authorization is so ambiguous as to be almost completely worthless, and certainly, since it fails to designate the nature of the operation authorized, and for which consent was given, it can have no possible weight under the factual circumstances of the instant case". 119 So.2d 652.

Summary
The evidence is clear and convincing that Dr. Pizzalotto removed Ms. Wilson's reproductive organs without obtaining her implied or expressed consent to that operation. The written instrument, signed by Ms. Wilson signified her consent only to a laparotomy, an exploratory operation, not a total hysterectomy, a radically different surgical procedure involving the removal of her womb and other reproductive organs. It is also clear that no emergency existed which threatened Ms. Wilson's life or health. Consequently, Dr. Pizzalotto committed a battery upon his patient for which Ms. Wilson is entitled to recover damages. Ms. Wilson is not entitled to recover damages for negligence or malpractice, however. The previous courts found that the doctor was not guilty of negligence or malpractice and the evidence supports these determinations. The judgments of the trial and appeals courts are reversed and the case is remanded to the court of appeal for a determination of the damages due to Ms. Wilson.
REVERSED AND REMANDED.
LEMMON, J., concurs with reasons.
MARCUS and BLANCHE, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
Being convinced that an emergency existed in which Ms. Wilson's consent to the removal of her reproductive organs is statutorily excused or implied at law under La. R.S. 40:1299.54, I dissent for the reasons hereinafter stated. The facts upon which this conclusion is based are as follows.
Dietrich Wilson, a twenty-seven year old unmarried black female, first saw Dr. Pizzalotto in September 1978 complaining of lower abdominal pain that became so severe during her monthly menstrual periods she was unable to walk. Dr. Pizzalotto's clinical examination indicated a potential adnexal cyst (a cyst in her tubes and ovaries caused by an outside source) or an endometrioma (an ovarian cyst internally caused by the disease endometriosis), in either case complicated by pelvic inflammatory disease (PID). Dr. Pizzalotto prescribed antibiotics in an attempt to decrease the inflammation and pain caused by PID and to enable a more thorough examination. He then scheduled Ms. Wilson for another visit; she did not keep the appointment and he did not see her again until November.
During the intervening months, Ms. Wilson consulted Dr. Linda Stewart (a doctor who treats females) for a second opinion. Dr. Stewart also diagnosed, and explained to her, that the pain was caused by PID and endometriosis, a disease whereby the endometrium, the lining of the uterus, backs up into the uterus, fallopian tubes and ovaries rather than being emptied from the uterus during the menstrual period. Once it backs up, the endometrium passes through the surface of the reproductive organs causing cysts and adhesions that form in reaction to blood irritating the surface of the organs. The adhesions cause the reproductive and other pelvic organs to become *866 attached to one another and increasingly distorted until, ultimately, sterility results.
Ms. Wilson admitted that she had conducted her own research on endometriosis and understood that the disease could result in sterility. When she returned to Dr. Pizzalotto in November, she gave her permission for a laparoscopy, a diagnostic examination involving insertion of a small telescope through the navel. On the consent to operate form, she crossed out and initialed the provision indicating an awareness that sterility may result from the operation because, as she explained, she knew that sterility would not result from the diagnostic examination. The laparoscopy enabled Dr. Pizzalotto to confirm the presence of endometriosis and PID, of which he informed Ms. Wilson, but it did not enable him to ascertain the extent of her condition. The reproductive organs had adhered to one another, making them difficult to see, and adhesions blocked much of Dr. Pizzalotto's vision.
Since endometriosis is seldom found and rarely severe in black women, particularly those who are young and unmarried, Dr. Pizzalotto did not diagnose or discuss with Ms. Wilson the possibility of sterility resulting from extreme endometriosis. Nor did he prescribe drug therapy because he limited its use to women who wanted to become pregnant in the near future and, moreover, believed that at most it would have alleviated the pain due to cramping during menstrual flow, but it would not have abated the pain due to the endometrioma which required surgical removal. Therefore, a laparotomy, exploratory surgery to remove any adhesions and the endometrioma and thereby at least temporarily restore fertility, was the only treatment proposed by Dr. Pizzalotto. He put his diagnosis and this proposed surgery in writing for Ms. Wilson and invited her questions. She had no questions because, as she testified, she already understood the possible consequences of endometriosis and assumed Dr. Pizzalotto would "just do what was necessary."
Ms. Wilson signed a consent to operate form in which she agreed to the performance of "operations and procedures in addition to or different from those now contemplated [laparotomy], whether or not arising from presently unforeseen conditions which the above doctor [Dr. Pizzalotto] or his associates or assistants may consider necessary or advisable in the course of the operation." The form included an acknowledgement by Ms. Wilson that the nature and purpose of the operation and possible alternatives, risks and complications had been fully explained to her. The form also stated, as did the previous one signed by her before the laparoscopy, that "I am aware that sterility may result from this operation. I know that a sterile person is incapable of becoming a parent." This time, Ms. Wilson did not cross out this provision as she did prior to the previous surgical procedure.
On the admit note advising the hospital of the proposed surgery, Dr. Pizzalotto went beyond his written diagnosis to Ms. Wilson and indicated not only the removal of the endometrioma he suspected was present in one ovary but the removal of one fallopian tube and that ovary. The doctor stated that this would not have resulted in sterility if everything else functioned normally. However, upon surgery, he found that the pelvic infection was beyond repair, Ms. Wilson's reproductive organs were so distorted by adhesions that she was already rendered sterile, and all reproductive organs would have to be removed prior to her leaving the hospital if he did not do it at that time because the continued and exacerbated infection and pain would have presented serious risks to her health. Before proceeding with the removal of her organs, Dr. Pizzalotto consulted with the assisting surgeon, Dr. Robert Rabalais, also an obstetrician and gynecologist, who agreed to the procedure because Ms. Wilson "was absolutely unable to conceive because she was already sterile, from any doctor's observation.... [B]oth ovaries were destroyed" and her tubes were completely blocked by adhesions. He considered that the failure to remove her organs would have been a "marked breach of competence" and it would have posed serious health problems for Ms. Wilson, including *867 aggravation of the already tremendous inflammatory reaction and possible rupture of the endometrioma, causing shock and further infection and adhesions.
The hospital pathologist, Dr. John D. Holden, who examined Ms. Wilson's organs after surgery, found that they were distorted almost beyond recognition and were marked by chronic infection. Hemorrhagic cysts were found within the ovaries; the fallopian tubes were scarred, tortuous and closely adhered to the ovaries, negating any possibility that they were open for conception. Dr. Holden was a member of a professional review committee and, in his opinion, the amount of adhesions present could not have been lysed and he would have brought Dr. Pizzalotto before the review committee if he had only attempted conservative surgery. He also testified that Dr. Pizzalotto would have been "highly criticized by other obstetricians and gynecologists" if he had delayed removal and required second surgery.
Two other obstetricians and gynecologists, Drs. Richard O. Dickey and Paul Jackson, Jr., testified that they would have attempted drug therapy prior to surgery and included the possibility of sterility resulting from extreme endometriosis in their diagnoses and discussions with Ms. Wilson. Both stated that they would have attempted only conservative surgery. Dr. Dickey considered that this would have given Ms. Wilson a 10-25% chance of conceiving as compared to the 90% chance of a normal woman. Dr. Jackson testified that Ms. Wilson's chances of conceiving would have been very small. Dr. Dickey admitted that it was also accepted practice to operate first and not use drug therapy and that some physicians would have chosen complete removal in a case as severe as Ms. Wilson's. Dr. Jackson admitted that if he had removed the organs and his assistant had agreed and the hospital pathologist subsequently confirmed that removal of the organs was the correct surgery to have performed because the patient could not have conceived, his actions would have been validated.
I consider that the record supports a finding that an emergency existed and that Ms. Wilson's consent to the removal of her reproductive organs can be implied. La.R.S. 40:1299.54[1] provides that "a consent to surgical... procedures ... will be implied where an emergency exists." An emergency is defined in the statute as "a situation wherein, (a) in competent medical judgment, the proposed surgical or medical treatment or procedures are reasonably necessary, and (b) a person authorized to consent... is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected...." The record indicates the extent of damage to Ms. Wilson's reproductive organs did not become apparent until during surgery at which time she was not available to give her consent and any delay in the removal of her organs at that time would have jeopardized her health. Dr. Pizzalotto considered that the risks to her health were so severe that surgery to remove the organs would have had to be performed within six to eight days (prior to her leaving the hospital). The assisting surgeon agreed that any delay in surgery would have placed her health in jeopardy. The pathologist considered that a delay in the removal of the organs would have been subject to professional criticism. Clearly, based on competent medical judgment, the removal of Ms. Wilson's reproductive organs was "reasonably necessary" and that a *868 delay to obtain her consent could "reasonably be expected to jeopardize" her health.
Accordingly, I respectfully dissent.
BLANCHE, Justice (dissenting).
The doctor did what was best for the patient and gets a judgment against him. The preponderance of medical opinion was that the patient's reproductive organs were so distorted by adhesions that she was already rendered sterile. Their removal was the best medical judgment ... "both ovaries were destroyed and her tubes were completely blocked by adhesions." Failure to remove them would have been a "marked breach of competence."
Not only has the plaintiff not suffered injuries she would not otherwise have incurred, but she was spared the trauma of another operation and further jeopardy to her health.
Although not relevant to the case before us, this writer wonders which way the sword would have swung had the doctor subjected plaintiff to another operation which may either caused her serious pain and suffering or possibly loss of life.
NOTES
[1] Dr. Pizzalotto relies on Babin v. St. Paul Fire and Marine Ins. Co., 385 So.2d 849 (La.App. 1st Cir.1980), for the position that a surgeon need not obtain a patient's actual consent to an operation if a reasonable patient who is aware of the risks would have submitted to the surgery. This statement finds no support in our law, and constitutes the single aberration from our law's uniform requirement of actual consent to surgery when no emergency situation exists.
[2] La.R.S. 40:1299.40 provides:

A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
[1] La.R.S. 40:1299.54 provides:

In addition to any other instances in which a consent is excused or implied at law, a consent to surgical or medical treatment or procedures, suggested, recommended, prescribed or directed by a duly licensed physician, will be implied where an emergency exists. For the purposes hereof, an emergency is defined as a situation wherein, (a) in competent medical judgment, the proposed surgical or medical treatment or procedures are reasonably necessary, and (b) a person authorized to consent under Section 1299.[5]3 is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected, or could reasonably result in disfigurement or impair faculties.