537 So.2d 251 (1988)
Joseph L. DOUGET, et al.
v.
TOURO INFIRMARY, et al.
No. 88-CA-0425.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 1988.
*252 M. Terrance Hoychick, Young, Hoychick & Aguillard, Eunice, for plaintiffs and appellants.
Dominic J. Gianna, Middleberg, Riddle and Gianna, Metairie, for defendant and appellee.
Before BYRNES, WILLIAMS and PLOTKIN, JJ.
WILLIAMS, Judge.
In this medical malpractice and battery action, plaintiffs, the widower and children of the deceased patient, Verdie L. Douget, appeal from a trial court judgment in favor of the defendant physician, Dr. William Ogden, II. Plaintiffs seek to pierce the statutorily presumed valid surgical consent form and to overturn the jury's findings that the defendant physician was not negligent in his care of decedent and had not committed battery when he removed certain of Mrs. Douget's organs without specific prior authorization when an emergency situation arose during surgery. For the reasons set forth below, we affirm.
FACTS
Verdie L. Douget, a forty-six year old mother of seven, died on November 30, 1981 of pseudomonas pneumonia. Her condition had been complicated by a massive infection known as sepsis.
Mrs. Douget had suffered a back injury in the late 1970's. In an effort to alleviate her resultant back pain, she underwent posterior lumbar fusion surgery in 1978. That operation, however, failed to provide relief from the pain she encountered daily while standing, sitting or lying down. Consequently, her physician, Dr. Henry LaRocca recommended that she undergo anterior lumbar fusion, a specialized procedure involving exposure of the spinal column through the abdominal cavity. As Dr. LaRocca had performed this specialized operation with appellee, Dr. Ogden, a surgeon specializing in thoracic and general surgery, on approximately three hundred occasions, Dr. LaRocca requested that Dr. Ogden perform the anterior approach of the operation.
*253 Dr. Ogden and Mrs. Douget met on October 4, 1981, after Mrs. Douget had entered the Touro Infirmary in anticipation of her anterior lumbar fusion operation. During their interview, Dr. Ogden explained to Mrs. Douget his segment of the anterior fusion procedure and obtained from Mrs. Douget her past medical history, which included appendicitis and an appendectomy in 1949; cholecystectomy[1] in 1965; hysterectomy in 1966, with complications of valley adhesions and severe intra-abdominal infection; tonsilectomy in 1970; and posterior lumbar fusion in 1978. She also informed him about her history of peptic ulcer disease and her allergies to penicillin, sulfa, Elavil and chloromycitrin. Dr. Ogden's own physical examination of her revealed numerous abdominal scars and an enlarged spleen, a condition not considered significant at the time. At the conclusion of the examination, Dr. Ogden advised Mrs. Douget that the lumbar fusion procedure would be more time consuming than normal due to her numerous abdominal adhesions, as those adhesions would have a binding affect in the interior of her abdomen.
On October 6, 1981, the informed consent form for the anterior lumbar fusion procedure was obtained by Dr. LaRocca. The following day, after she was prepped for surgery by Dr. Ogden, an internist and an urologist, Dr. Ogden commenced the anterior approach portion of Mrs. Douget's surgery. During the approach, Dr. Odgen encountered hundreds of adhesions which he described as being like "glue between one's fingers", some of which were flimsy while others were very tough. Nevertheless, the operation continued and he mobilized the small and large intestines and removed the symphatic chain. This latter procedure was performed in order to prevent a pinched nerve situation from developing due to Mrs. Ogden's prior posterior fusion having caused the symphatic chain to cover the spine. Dr. Ogden then retracted the intestines and the omentum to the right and upwards towards the chest so that another surgeon could begin removing the disc material. However, just as the other surgeon began an incision on the discs, Mrs. Douget hemorrhaged. "Buckets of blood" began to pour out of her upper abdomen, above the surgical site.
In order to locate the source of the bleeding, Dr. Ogden extended the surgical site upward until he found that the renal vein, "the big vein that drains from the left kidney", had torn from the ovarian vein.[2] Dr. Ogden sutured the torn vein(s), which stopped the hemorrhaging. However, as a result of the incident, the renal vein's effectiveness was reduced by seventy-five percent (75%) creating the likelihood that the left kidney would probably be destroyed.
The urologist who had prepped Mrs. Douget for surgery was consulted about the viability of the organ. He recommended removing the left kidney because it had only a slight chance of survival and Mrs. Douget had a normal right kidney. If the kidney was not removed and then it perished, severe sepsis would probably develop; while if it were removed, only a potential for infection in the vacated space would be created. After weighing these considerations, Dr. Ogden removed Mrs. Douget's left kidney.
In the search for the source of the massive hemorrhage, the hilum of the spleen was also damaged. The flimsy capsules covering the spleen, which were stuck together because of Mrs. Douget's enlarged spleen, had torn. Although this bleeding was initially packed off, Dr. Ogden did not believe it was possible to save the spleen since the damage involved the area where large blood vessels entered the spleen. Therefore, he deemed it necessary to remove *254 the spleen and he performed that procedure.
Thereafter, the operation proceeded normally and the anterior fusion was completed. Dr. Ogden inspected the abdomen for bleeding, finding none, he closed the abdomen and sent Mrs. Douget to the recovery room. However, approximately three and one-half hours later, Mrs. Douget's blood pressure dropped suddenly. Her abdomen had become swollen, indicating possible abdominal bleeding. Dr. Ogden returned Mrs. Douget to surgery where he found the mesenteric vessels in mid-abdomen and on the intestional wall were bleeding.[3] This bleeding was stopped and Mrs. Douget was returned to the recovery room.
In the weeks that followed, Dr. Ogden had a significant portion of Mrs. Douget's post-operative care.[4] His hospital notes indicated occasional improvement in Mrs. Douget's condition such as on October 20th and November 10th, when Mrs. Douget was able to walk with a brace. Interspersed with these improvements, however, she faced numerous set-backs.
On October 29th, a subphrenic abscess, possibly caused by pancreatisis, developed in Mrs. Douget's left upper abdomen under the diaphragm. Then on November 5th, she contracted drug related thrombocytopenia. Neither Dr. Ogden, the hematologist, nor the internist knew which of her medications caused the thrombocytopenia. To complicate matters further, her ulcers became active again, causing massive bleeding in her stomach, which required her to undergo a gastric resection.
On November 11th, a gastroenterologist inserted a lighted tube into Mrs. Douget's upper stomach. Finding massive bleeding, the gastroenterologist called Dr. Ogden out of another surgery and informed him that Mrs. Douget had a blood clot and five ulcers which were bleeding profusely. Dr. Odgen immediately performed the gastric resection, despite the lack of specific authorization to perform that procedure.
The weekend before Thanksgiving, Mrs. Douget's health deteriorated. On November 29, 1981, her left foot became gangrenous from septicemboli. The following day, November 30, 1981, she died of pneumonia and sepsis.
PROCEDURAL HISTORY AND TRIAL EVIDENCE
Plaintiffs, the widower and children of Verdie Douget, filed suit against Touro Infirmary, Dr. LaRocca and Dr. Ogden.[5] Their petition claimed $500,000.00 for the wrongful death of Mrs. Douget and $120,000.00 for her medical expenses.[6] Each of the plaintiffs also claimed $500,000.00 as Mrs. Douget's survivors.
Prior to trial, defendants filed a motion in limine, seeking the exclusion of any evidence at trial which would challenge the validity of the printed consent form(s) used in connection with the treatment of Mrs. Douget. Even though the plaintiffs opposed the motion, claiming they were entitled to delve into the issue of informed consent in order to determine whether Mrs. Douget was induced into signing the consent form because of ineffective and incomplete disclosure, the trial court granted defendants' motion in limine.
Commencing on February 9, 1987, the case was tried before a jury. For their witnesses, plaintiffs called Mr. Douget, two of Verdie Douget's daughters and her sister, Dr. Ogden, Dr. LaRocca and Dr. Calvin Openshaw. Dr. Openshaw, a general and thoracic surgeon practicing in Hutchinson, Kansas, was tendered by plaintiffs as their expert witness in the field of thoracic surgery[7], *255 even though he admitted that he had never seen or participated in an anterior lumbar fusion operation nor had he ever performed a posterior lumbar fusion. Dr. Openshaw also admitted he never read the authoritative medical paper on anterior lumbar fusion which was written by Dr. LaRocca.
During plaintiffs' examination of Dr. LaRocca, the physician was asked why Mrs. Douget was the only patient to die out of the three hundred patients on whom Dr. LaRocca and Dr. Ogden had performed the anterior lumbar fusion. Dr. LaRocca's response was as follows:
She was the one death because she had insurmountable problems after the surgery that arose from reactivation of peptic ulcers, disease from infection arising on the basis of the fact that the abdomen was scarred, and then, the pseudomonas. That is what Dr. McCutcheon or Ogden was talking about. It is a germ that does not attack healthy people, it only attacks people who can't resist it. Her condition was one of chronic illness and repeated surgery and infection and antibiotics, and when you have pseudomonas under those circumstances there was no way for her to manage the drugs we have. We weren't capable of managing it. That was what ultimately killed the lady. It's a chain of events that sapped her energy.
In contrast to Dr. LaRocca's testimony which was based upon his first hand knowledge, Dr. Openshaw testified that he formulated his medical opinion on this case by bringing to bear his own experience and applying it to the particular case. Thus, when making his determination that Dr. Ogden's actions fell below the required standard of care, he looked first to the hospital records of Dr. Ogden's actions and then to the appropriate medical and surgical journals on the subject.
Dr. Openshaw opined that Dr. Ogden negligently used excessive force when he retracted Mrs. Douget's intestines because he should have been more careful since Mrs. Douget had adhesions from her prior hysterectomy. On cross examination, however, Dr. Openshaw admitted that because of the manner in which the anterior fusion procedure is performed, Dr. Ogden could not have seen the ovarian and renal veins. Moreover, his only evidence supporting his conclusion that Dr. Ogden did not use gentle force, or the level of force Dr. Openshaw believed Dr. Ogden should have used, is the fact the vein tore. He also admitted on cross-examination that adhesions require an appropriate degree of care in judgment, knowledge and skill because a surgeon cannot know how different adhesions will react.
Based upon his review of the surgical notes, Dr. Openshaw found the removal of the left kidney was not only performed substandardly, but was also substandard care. He claimed it was negligence to remove the kidney while there was collateral circulation from small veins, as there was no reason to increase Mrs. Douget's trauma by removing the organ at that time. Additionally, Dr. Openshaw believed the subphrenic abscess was caused by the removal of the kidney and spleen, rather than the pancreatitis, as Dr. Ogden had testified.
Concerning the removal of Mrs. Douget's spleen, Dr. Openshaw testified that the "spleen was apparently damaged" and "no real effort was made to salvage the spleen." In his opinion, the removal of the spleen caused the pneumococci septicemia or blood poisoning, which in Dr. Openshaw's opinion, eventually caused her death.[8]
Dr. Openshaw also opined that because of the locale of the pancreas, which lies under the spleen, Mrs. Douget's pancreatitis was caused by the manipulation of the pancreas during the anterior fusion procedure. Dr. Openshaw testified he "would expect there to be some slight bruising at *256 the very least of pancreatic tissue in removing the spleen" and there "would probably be more of that bruising in removing the kidney" because it lies just below the spleen. Consequently, when he read Dr. Ogden's notes on the second surgery of October 7, which referred to the bleeding messenteric vessels, Dr. Openshaw inferred that the pancreas was damaged because he would not expect that area to bleed unless damage had occurred to the pancreas.
This conclusion, however, lost much of its support during cross-examination when Dr. Openshaw was shown an authoritative textbook which indicated that following stomach operations, acute pancreatitis can occur even though no direct trauma is inflicted upon the pancreas. Confronted with the textbook, Dr. Openshaw was forced to admit that there are numerous causes of amylase elevation in the blood, including peptic ulcers, splenic obstruction and certain drugs. Nevertheless, he continued to maintain that Dr. Ogden had harmed the pancreas because of the increased serum amylase level and his own knowledge that the "procedures could not be done without some manipulation of the pancreas."
Dr. Openshaw also testified that the cause of Mrs. Douget's thrombocytopenia was the antibiotic chloromycelin even though any of the four drugs she was taking could have caused the thrombocytopenia.[9] However, he did acknowledge that Dr. Ogden and the hematologist treated the thrombocytopenia successfully. Then he testified that he found the gastric resection of November 11th negligently performed because the vagus nerves were not cut and the antrum of the stomach was not removed. He claimed both these features are a standard part of gastric operations for the reduction of gastric acidity. He also opined that Dr. Ogden was negligent in electing to do the gastric resection because her bleeding was stress induced and additional surgery only increased the level of her stress. In his opinion, proper treatment meant avoiding surgery until absolutely necessary, even though Mrs. Douget's condition was serious, as she was vomiting blood due to the five ulcers, blood clot, and clot of Maalox.
Dr. Openshaw's testimony concluded with the determination that the cause of Mrs. Douget's death was septicemia and not psuedomonas pneumonia because the evidence of psuedomonas had disappeared by November 26th, while evidence of septicemia was noted as early as October 14th. He also concluded that the medical record showed the only cause of Mrs. Douget's suffering and death was the negligence of Dr. Ogden in both his performance of the anterior fusion and his post-operative care.
At the close of plaintiffs' case, plaintiffs voluntarily dismissed Dr. LaRocca and Touro Infirmary. At that time, Dr. Ogden's counsel motioned for a mistrial and for a directed verdict because Dr. Openshaw had admitted that all the issues involved judgment calls. Both motions were denied. Dr. Ogden's counsel also motioned to strike the entirety of Dr. Openshaw's testimony due to the plaintiffs' failure to supplement discovery responses, when Dr. Openshaw's trial testimony revealed he had changed his opinion as to the cause of Mrs. Douget's death.
Although the parties had perpetuated Dr. Openshaw's testimony due to his having a malignant tumor, he appeared at trial to testify and admittedly changed his opinion as to the cause of death after he heard defense counsel's opening statement. Notwithstanding the detrimental effect this had upon Dr. Ogden's defense, the trial court denied Dr. Ogden's motion to strike because defense counsel could have deposed Dr. Openshaw the evening following opening statements, after defendants became aware that Dr. Openshaw would testify at trial.
At the close of trial, the jury found in favor of Dr. Ogden. Their interrogatory concluded: Dr. Ogden was not at fault in *257 his treatment of Mrs. Douget; Dr. Ogden's fault was not the cause of Mrs. Douget's death or injuries; and an emergency arose during surgery which authorized Dr. Ogden to remove organs without specific authorization. The poll indicated the jurors voted 12-0 in favor of Dr. Ogden being free of negligence and 9-3 in favor of Dr. Ogden not having committed a battery.
Plaintiffs moved for judgment notwithstanding the verdict and, alternatively, for a new trial. Plaintiffs asserted the jury's verdict on the issues of battery and negligence was clearly erroneous because Dr. Ogden committed a battery by removing Mrs. Douget's kidney and repairing the ventral hernia during the anterior approach and was negligent in his care and treatment of Mrs. Douget. The court denied both motions, but entered an order granting plaintiffs a devolutive appeal.
INFORMED CONSENT
Plaintiffs assert the trial court erred in granting defendant's Motion in Limine, which precluded plaintiffs from questioning the adequacy of the patient consent form at the trial on the merits. We disagree. LSA-R.S. 40:1299.40 provides that if a patient's written consent form satisfies the statutory requirements, the consent form is entitled to an evidentiary presumption of validity. Thus, because Mrs. Douget's facially valid consent form created a presumption of informed consent, including adequate advice of the risks connected with the surgery, and because there is sufficient evidence within the record showing plaintiffs failed to rebut that presumption by proving misrepresentation or by showing Mrs. Douget had not been informed of a "known" risk, we find that in this particular instance the trial court did not err by granting defendant's Motion in Limine.
a. Procedure
Although both parties submitted memoranda supporting their positions on defendant's Motion in Limine, the motion was not resolved until the morning of trial. We find fault with this procedure because the gravity of motions in limine and/or motions for summary judgment designed to dispose of the lack of informed consent issue, LSA-R.S. 40:1299.40(A) and (B), require that such motions be resolved at a hearing, on the record, held prior to the date of trial. By disposing of the lack of informed consent issue sufficiently in advance of trial, an equitable result is attained because the parties may then prepare the theory of their case for trial with foreknowledge of whether or not a party will be allowed to introduce evidence modifying or limiting the consent form. In addition, this procedure creates a proper remedy for either writ of review or appeal as it provides the parties an opportunity to seek review of the trial court's ruling prior to the date of trial and/or provides a record for the reviewing court to evaluate the correctness of the lower court's ruling.
b. Merits
The standards used to measure a patient's consent to treatment are contained in LSA-R.S. 40:1299.40(A) and (C). LaCaze v. Collier, 434 So.2d 1039, 1046 (La. 1983). This uniform consent law requires disclosure of the nature and purpose of a medical or surgical procedure, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, or the loss or loss of function of any organ or limb or distinguishing scars. Hondroulis v. Schumacher, 531 So.2d 450, 452-453 (La.1988). In the absence of proof of inducement by misrepresentation of material facts, compliance with the statutory requirements creates a presumption of valid consent that, if not rebutted, cannot be modified or limited at trial. LSA-R.S. 40:1299.40(A), (B); see Hondroulis v. Schumacher, 531 So.2d at 453; LaCaze v. Collier, 434 So.2d at 1047.
Despite this presumption, plaintiffs continue to question the validity of Mrs. Douget's consent because the consent form for the anterior fusion was obtained and signed by Dr. LaRocca, but not by Dr. Ogden. Plaintiffs question whether Dr. LaRocca could provide adequate disclosure of the known risks of the anterior approach, the portion of the anterior fusion performed by Dr. Ogden. They claim *258 these circumstances vitiated Mrs. Douget's consent, under the exception to valid consent contained in LSA-R.S. 40:1299.40(A) and (B), as any failure to disclose essential information about the anterior approach would be tantamount to a misrepresentation. However, due to the total absence of proof that the execution of Mrs. Douget's consent was induced by misrepresentation of material facts,[10] we can only conclude that plaintiffs are attempting to rebut the statutory presumption of valid consent, by establishing that Mrs. Douget was not told of "known risks" in the categories enumerated in her consent to treatment form.
Under Louisiana's Uniform Consent Law, a physician is required to advise "a patient of any material consequences which would influence the decision of a reasonable person in the patient's condition." Hondroulis v. Schumacher, 531 So.2d at 454. As it would be impractical and unrealistic to require that all known risks be disclosed, the uniform consent law implies that "rare or remote risk[s] need not be disclosed." Hondroulis v. Schumacher, 531 So.2d at 455. "Disclosure must be made only when a risk is medically known and of a magnitude that would be material in a reasonable patient's decision to undergo treatment." Hondroulis v. Schumacher, 531 So.2d at 455. This duty of disclosure, however, applies only to reasonably foreseeable material risks. Hondroulis v. Schumacher, 531 So.2d at 456.
Thus, in order to rebut the statutory presumption that Mrs. Douget's consent was valid, plaintiffs were required to show in their opposition to defendants' Motion in Limine, that the adverse results of Mrs. Douget's surgery were known, significant and material risks, which should have been disclosed to her by her physicians; those risks were not disclosed to her by her physicians; she was unaware of those risks; and a reasonable person would have refused surgery because of those risks. Hondroulis v. Schumacher, 531 So.2d at 456.
Because the results alone of Mrs. Douget's catastrophic anterior approach operation do not establish a known, material risk, Hondroulis v. Schumacher, 531 So.2d at 456, it was incumbent upon the plaintiffs to prove by other means that the adverse results were a known, material risk which were not disclosed. Plaintiffs, however, failed to introduce evidence at the hearing on the motion or at trial, showing the tearing of the ovarian vein was a known and significant risk about which Mrs. Douget should have been warned. Rather, the evidence presented at trial indicated that difficulties with the ovarian vein had never been encountered during prior anterior approach procedures. Thus, plaintiffs did not establish that the risks incurred were foreseeable so that the physicians had a duty to inform her of those risks.
LSA-R.S. 40:1299.40 implies that "rare or remote risk[s] need not be disclosed," Hondroulis v. Schumacher, 531 So.2d at 455 because it is the "physician's superior knowledge of reasonably foreseeable adverse consequences which creates the duty to make a specific disclosure"; therefore, no duty to disclose unforeseeable and unknown risks exists. Hondroulis v. Schumacher, 531 So.2d at 456; See also Boland, Gary L., "The Doctrine of Informed Consent in Medical Procedure in Louisiana," 45 La.L.Rev. 1, 5 (1984) [negligence in lack of informed consent is the physician's failure to exercise due care in the disclosure of pertinent information about possible complications and risks of treatment]. Consequently, as our review of the record discloses that the risks encountered during the catastrophic operation on October 7, 1981, "were so rare or remote that they would not be considered `known' risks under the statute," see LaCaze v. Collier, 434 So.2d at 1047, Mrs. Douget's physicians had no duty to disclose the unforeseeable and unknown risks that actually occurred during the anterior approach.
*259 For these reasons alone, plaintiffs' proof failed to rebut the statutory presumption of informed consent created by Mrs. Douget's consent form. However, because plaintiffs are also attempting to vitiate the consent because Dr. Ogden did not sign the consent form, those arguments will also be addressed.
On October 4, 1981, Dr. Ogden informed Mrs. Douget that the adhesions resulting from her prior surgeries would complicate the anterior fusion procedure. She signed the consent form on October 6, 1981 even though she knew death and loss of bodily organs were known risks of the procedure and only after discussing with both Dr. LaRocca and Dr. Ogden the nature, purpose and known risks of their portions of the anterior fusion procedure. Moreover, Dr. LaRocca, the physician who obtained and signed Mrs. Douget's consent form, wrote the authoritative medical journal article on anterior fusion and performed the specialized procedure with Dr. Ogden approximately three hundred times. Under these circumstances, the fact that the consent form was signed by Dr. LaRocca, but not by Dr. Ogden, is no indication that material risks of the anterior approach were not disclosed to Mrs. Douget.
For these reasons, we reject plaintiffs' arguments questioning the validity of Mrs. Douget's consent form. And we affirm the trial court's judgment, granting defendant's Motion in Limine which excluded from the trial any evidence tending to modify or limit Mrs. Douget's authorization for the anterior fusion procedure.
BATTERY
Plaintiffs' next contention is the jury manifestly erred when it found Dr. Ogden did not commit battery by performing the nephrectomy, splenectomy, hernia repair[11] and the gastric resection.[12] Plaintiffs also claim the trial court erred by denying their post-trial motions which were based upon their objections to the jury finding that no battery occurred. By a 9-3 vote, the jury had found "an emergency situation arose during the surgery of Mrs. Douget which authorized Dr. Ogden to remove organs without specific authorization." However, because Dr. Ogden did not have specific authorization to perform a splenectomy and a nephrectomy; because Dr. Ogden admitted that, at the time the kidney and spleen were removed, Mrs. Douget was no longer in a life threatening situation; and because Mr. Douget was in the hospital's waiting room during surgery, plaintiffs urge us to find the removal of those organs constituted a battery. We remain unpersuaded by plaintiffs' arguments and agree with the lower court that the removal of Mrs. Douget's spleen and left kidney did not constitute a battery. Not only were the procedures authorized by Mrs. Douget's implied consent, but they were also performed under the emergency exception to the consent rule.
Plaintiffs' lack of consent-battery theory, based upon Pizzalotta v. Wilson, 437 So.2d 859 (La.1983), sounds in intentional tort and is a separate theory of action from lack of informed consent, which sounds in negligence. See Boland, "The Doctrine of Lack of Consent and Lack of Informed Consent in Medical Procedure in Louisiana", 45 La. L.Rev. 1 (1984). The battery theory incorporates Justice Cardozo's philosophy that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages." *260 Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 93 (1914), as cited in Pizzalotto v. Wilson, 437 So.2d at 862. This theory, however, is inapposite because Mrs. Douget had impliedly consented to the removal of her spleen and kidney.
A physician commits battery when he undertakes a particular surgical procedure without the express or implied consent of the patient or an authorized person, except when an emergency requires immediate surgery for the preservation of life or health under circumstances when such consent cannot be practicably obtained. See Pizzalotto v. Wilson, 437 So.2d at 861 and 862. The language in the consent to treatment form that Mrs. Douget signed on October 6, 1981 authorized Dr. Ogden to perform the anterior lumbar fusion and "further authoriz[ed] the doctors to perform at the time of the above-described operation or procedures, any additional operations or procedures beyond those ... contemplated which in their judgment are advisable for my well being." (Consent to Treatment Form, Paragraph 5) Mrs. Douget also acknowledged that she understood the risks of the anterior fusion procedure to include "the loss of or loss of function of body organs." (Id., Paragraph 6) The latter acknowledgment being located in the paragraph dealing with the risks of brain damage, paralysis, paraplegia, quadriplegia and loss of limbs.
These paragraphs clearly refer to consequences, in addition to or different from, those expressly contemplated for the anterior fusion procedure. They address risks of surgery and conditions that might arise during the anterior lumbar fusion procedure that may have been unanticipated and unforeseen at the time Mrs. Douget signed the informed consent form. Therefore, when Mrs. Douget signed the consent form, she acknowledged that her surgical risks included the possible loss of organs and she authorized her physicians to perform any additional operations beyond those contemplated which in the physicians' judgment were advisable for her well being.
Consequently, when Dr. Ogden performed the nephrectomy and splenectomy, those procedures were performed with Mrs. Douget's implied consent. But, even if the procedures had not been impliedly authorized, their performance was not a battery because the record supports the jury's finding that an emergency existed so as to exempt Dr. Ogden from needing express or implied authorization for the removal of the organs.
An emergency is statutorily defined as a situation wherein: 1) in competent medical judgment, the proposed surgical or medical treatment or procedures are reasonably necessary and 2) a person authorized to consent under Section 1299.53 is not readily available, and any delay in treatment could reasonably be expected to jeopardize the life or health of the person affected, or could reasonably result in disfigurement or impair faculties. LSA-R.S. 40:1299.54; See also Pizzalotto v. Wilson, 437 So.2d at 862; Boland, 45 La.L.Rev. 1 (1984).
Plaintiffs do not contest that the evidence presented at trial overwhelmingly proved an emergency situation developed during the anterior approach, instead, plaintiffs contend the emergency ceased when Mrs. Douget's condition became stabilized. We, however, find this argument unfathomable. At the time these two surgical procedures were performed, Mrs. Douget's condition had just become stabilized. Her body had been traumatized by the previous catastrophic situation; every moment she remained on the operating table increased risk of infection from exposure and complications inherent from anesthesia. The surgical procedures Dr. Ogden performed were in his sound medical judgment, reasonably necessary to prevent further jeopardy to Mrs. Douget's life or health.
Moreover, Mr. Douget, a person authorized to consent under LSA-R.S. 40:1299.53 was not readily available. He was in the waiting room. Prolonging the anterior fusion operation further by requiring Dr. Ogden to leave the operating room and explain the situation to Mr. Douget, to provide him with information sufficient for his *261 informed consent, "could reasonably have resulted in jeopardizing Mrs. Douget's life or health, or could have impaired her faculties." Thus, the jury did not manifestly err when it found an emergency situation existed within the meaning to LSA-R.S. 40:1299.54, so as to require immediate surgery.
Consequently, Dr. Ogden did not commit a battery when he removed Mrs. Douget's organs without her express consent because the procedures were impliedly consented to in Mrs. Douget's consent to treatment form and by the emergency exception of LSA-R.S. 40:1299.54.
NEGLIGENCE
Plaintiffs' final argument contests the jury finding that Dr. Ogden's actions were free from fault and the trial court's judgment that denied plaintiffs' motions for judgment not withstanding verdict and for a new trial filed because of the jury finding. We find these arguments are without merit as our review of the trial record establishes a reasonable factual basis for the jury's 12-0 conclusion that Dr. Ogden was not negligent.
On appeal, the plaintiffs' negligence argument focuses upon the amount of force Dr. Ogden exerted while retracting the intestines and omentum during the anterior fusion procedure. Plaintiffs claim excessive force was exerted during the retraction because the force exerted caused the ovarian vein to tear from the renal vein. Because Mrs. Douget's prior hysterectomy generated numerous adhesions, plaintiffs contend Dr. Ogden should have foreseen the possibility of the complications that occurred and should have exercised the degree of care necessary to prevent the emergency situation.
With hindsight, it is clear that the force exerted during the retraction of the intestines and omentum was greater than Mrs. Douget's ovarian and renal veins could bear. Acknowledgment of that fact, however, does not imply Dr. Ogden was negligent.
At trial, the jury was presented with conflicting testimonial evidence which included, Drs. LaRocca and Ogden's eye witness testimony indicating Dr. Ogden's actions were negligence free and Dr. Openshaw's opinion, derived from his evaluation of the hospital record and surgical notes, indicating Dr. Ogden's actions were rife with fault. As reflected in the interrogatories and jury poll, the jury assessed the credibility of the witnesses and then determined which evidence they found most credible and realistic.
The jury was presented with evidence illustrating that in the three hundred anterior fusion procedures performed by Dr. Ogden, the ovarian vein had never been the cause of difficulties. The evidence also revealed that because each adhesion is different from the next, as some are flimsy while others are tough and glue-like, knowledge that Mrs. Douget had numerous adhesions was not tantamount to forewarning of the events that did occur. Consequently, credible evidence indicated that Dr. Ogden used the appropriate degree of care in light of known difficulties of the specialized surgical procedure and Mrs. Douget's individual medical history.
The jury was presented sufficient evidence with which it could reasonably conclude that under the circumstances, Dr. Ogden could not have anticipated the pressure he exerted upon the intestines and omentum would cause hemorrhaging far above the surgical site. Thus, as it cannot be shown that the jury's evaluation of testimony and findings of fact are clearly erroneous, we will not disturb their evaluation on appeal. Dean v. Terrebonne Parish Police Jury, 510 So.2d 82 (La.App. 1st Cir. 1987).
Accordingly, we affirm both the jury's finding and the trial court's denial of plaintiffs' post-trial motions, as they pertain to whether Dr. Ogden was negligent in his care of Mrs. Douget.
For the reasons assigned, the judgment of the trial court is affirmed. All costs are assessed against plaintiffs/appellants.
AFFIRMED.
NOTES
[1] Removal of the gall bladder.
[2] Apparently, as a result of Mrs. Douget's prior hysterectomy, the ovarian vein had adhesed low in the pelvis. Thus, when Dr. Ogden retracted the small and large intestines and the omentum, pressure was placed upon the ovarian vein and the pressure traveled up the vein until it found a weak spot, the site of the hemorrhage. The effect that the anterior procedure would have upon Mrs. Douget's ovarian vein had not been anticipated by Dr. Ogden because during the previous 300 anterior fusions performed by Dr. Ogden and the ovarian vein had never been the source of trouble.
[3] All testimony indicated that this bleeding began after the completion of the first surgery.
[4] Because of her post-operative complications, approximately seven other specialists were also involved in her care.
[5] Dr. McCutcheon was sued but never served and Dr. LaRocca and Touro Infirmary were voluntarily dismissed at the close of the plaintiffs' presentation of evidence.
[6] U.S. Fidelity and Guaranty Co., the worker's compensation insurer of Mrs. Douget's employer, intervened and requested reimbursement for the $105,811.86 it had paid for Mrs. Douget's medical expenses.
[7] The court specifically did not recognize Dr. Openshaw as an expert in orthopedic surgery because his only training in that field occurred during a six month period in 1949-1950.
[8] Dr. Openshaw had read an article published in 1981 that indicated patients without spleens were 500 times more likely to develop a septic infection than those who have their spleens.
[9] Dr. Openshaw testified, "this was a drug which very probably caused her platelet deficiency" and added to her bleeding problem.
[10] After the October 7th operations, Mrs. Douget was cognizant for a number of weeks. The record, however, does not reveal any indication that during her period of convalescence she notified her family of misrepresentations made to her by Drs. Ogden or LaRocca.
[11] Initially, we note that the hernia repair could have been an inclusive part of the entrance and exiting of the abdominal approach procedure, so that it was an integral part of that operation. However, because little or no evidence exists in the record concerning this procedure, the jury was not required to specifically consider the issue, and no decision addressing the hernia repair was rendered by the trial court, we find this is not an appealable issue.
[12] The jury interrogatory did not question whether the gastric resection was a battery. Nor did plaintiffs' post-trial motions refer to the gastric resection. Thus, the issue of whether the gastric resection constituted a battery is not an appealable issue. Regardless, plaintiffs' brief concedes credible evidence exists showing an emergency situation arose within the meaning of LSA-R.S. 40:1299.54, authorizing Dr. Ogden to perform the gastric resection.